**Karen M. SCHMIDT and Daniel J. Schmidt, Plaintiffs,**

v.

**FORTIS INSURANCE COMPANY, Defendant.**

**No. C03–3094–MWB.**

United States District Court, N.D. Iowa, Central Division.

Jan. 3, 2005.

Chad Andrew Swanson, Dutton Braun Staack Hellman Iversen, Waterloo, IA, for Plaintiffs.

Debra Lynne Hulett, Michael W Thrall, Nyemaster Goode Voigts West Hansell & O'Brien, PC, Des Moines, IA, for Defendant.

MEMORANDUM OPINION AND OR-DER REGARDING CROSS–MO-TIONS FOR SUMMARY JUDG-MENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................... 1174
    A.  Factual Background .......................................... 1174
        1.  General background ...................................... 1174
        2.  Pertinent medical background ........................... 1175
        3.  The search for health insurance ........................ 1179
            a.  Initial contact with Midwest Benefits .............. 1179
            b.  Life Investors application ......................... 1180
            c.  Fortis application ................................. 1182
        4.  Fortis's rescission ..................................... 1184
        5.  Summary of factual disputes ............................ 1188

B. *Procedural Background* ...........................................1188

II. *LEGAL ANALYSIS* ...............................................1189
   A. *Standards For Summary Judgment* .................................1189
   B. *Equitable Rescission* ...........................................1191
      1. *Generally* ...............................................1191
      2. *Construing and interpreting insurance contracts under Iowa law* ....1192
      3. *Question 18(k)* ...........................................1194
         a. *The question* .........................................1194
         b. *Can Kiel's knowledge be imputed to Fortis?* .................1195
            i. *Knowledge of tamoxifen use* ............................1195
            ii. *Scheme to perpetuate a fraud on Fortis?* ...................1199
         c. *"Treatment for"* .........................................1203
            i. *Arguments of the parties* ...............................1203
            ii. *Analysis* ..........................................1206
         d. *"Consulted with a physician concerning"* .....................1209
            i. *Arguments of the parties* ...............................1209
            ii. *Analysis* ..........................................1211
      4. *Question 15* .............................................1213
         a. *The question* .........................................1213
         b. *Arguments of the parties* ...............................1213
         c. *Analysis* .............................................1214

III. *CONCLUSION* .................................................1217

## I. INTRODUCTION

### A. Factual Background

#### 1. General background

The plaintiffs, Karen Schmidt and Daniel Schmidt ("Schmidts"), are husband and wife. Karen is a self-employed business owner and is currently the owner/operator of several businesses including a video rental and tanning business (known as "Home Video" and "The Sun Tanner"), a payday loan business housed near the video and tanning business, Hampton Home Store and the Coonley apartment building. Karen is also a Radio Shack dealer in connection with the video and tanning businesses, and a U.S. Cellular agent in connection with the Hampton Home Store. In approximately 1988, Karen was personally involved in securing a health and disability insurance plan for a full-time employee of the video and tanning business. From approximately 1990 through August 2001, Daniel Schmidt was employed by the Hampton–Dumont Community School District as the director of maintenance. In approximately 1988, prior to Daniel obtaining his position with the Hampton–Dumont Community School District, the Schmidts purchased a family health insurance policy from Blue Cross Blue Shield ("BCBS"). The Schmidts were covered by the BCBS policy when Karen was diagnosed with breast cancer and underwent a mastectomy followed by chemotherapy in 1989. When Daniel began his employment with the Hampton–Dumont Community School District, and secured health insurance for his family via that employment, the Schmidts terminated their BCBS policy on the basis of cost and duplication of benefits. At no point did the Schmidts have health insurance coverage through any of the businesses that they owned.

In the summer of 2001, the Schmidts were anticipating the purchase of the Hampton Home Store—a major appliance retail store which also services appliances. At this time, the Schmidts were considering the possibility of Daniel ending his employment with the Hampton–Dumont Community School District and co-operating the Hampton Home Store with Karen.

The sale of the Hampton Home Store to the Schmidts was to be completed on August 13, 2001. At this time, the Schmidts had health insurance through the Hampton–Dumont Community Schools under a self-funded plan—but, this coverage would lapse following the termination of Daniel's employment with the school district.[1] Therefore, obtaining replacement health care insurance prior to the completion of the sale of the Hampton Home Store to the Schmidts became a priority. Karen was particularly concerned with obtaining replacement coverage in light of her breast cancer history, which is explained in great detail below. When Daniel expressed an interest in leaving his position at the school district in favor of co-operating the Hampton Home Store with Karen, Dr. Lee Morrison, the superintendent of the school district, recommended that the Schmidts contact the school district's insurance agent, Loren Kiel, at Midwest Group Benefits, Inc. in Decorah, Iowa, to discuss their options for purchasing replacement health care insurance.

### 2. Pertinent medical background

Dr. Keith Hansen, D.O., has been Karen's primary care physician since 1973. On March 21, 1989, a mammogram performed on Karen revealed the presence of a mass in her right breast. A biopsy of the mass was conducted on that same day. The biopsy revealed a medullary carcinoma and Karen was diagnosed with stage II breast cancer, with one of eighteen lymph nodes positive. On March 29, 1989, Karen underwent a radical partial mastectomy with axillary dissection. The surgery was performed by Dr. Hansen and Dr. Richard Francis, M.D. The last time Karen had detectable residual cancer was at the time of her mastectomy on March 29, 1989.

Following the surgery, Karen began seeing Dr. Peter Silberstein, M.D., who at the time[2] was an oncology/hematology specialist at The Park Clinic[3] in Mason City, Iowa. Karen's first visit with Dr. Silberstein was on April 20, 1989. Under Dr. Silberstein's supervision, Karen underwent six months of chemotherapy—from approximately April 1989 through September 1989. In approximately November of 1989, following the completion of the chemotherapy regimen and after finding that the tumor was estrogen and progesterone receptor positive, Dr. Silberstein prescribed the prescription drug tamoxifen[4] for Karen—which Karen then began taking.[5] The last progress note in Karen's

---

1. The Schmidts were aware that COBRA continuation coverage was available to them following the termination of Daniel's employment with the school district, but they did not believe it was a viable option as they were seeking long-term health coverage.

2. Dr. Silberstein is currently the division chief of hematology/oncology at Creighton University Medical Center in Omaha, Nebraska. Plaintiffs' Supplemental Appendix in Support of Plaintiffs' Motion for Summary Judgment and in Resistance to Defendant's Motion for Summary Judgment, Doc. No. 50, at 266. ("Plf.s' Supp.App.").

3. What was known as The Park Clinic in 1989, is now the Mercy Cancer Center. Plf.s' Supp.App. at 266.

4. The brand name for tamoxifen is Nolvadex ®.

5. Dr. Silberstein's progress notes include several references to the progression of Karen's Tamoxifen usage. For example:

- August 14, 1989—"We discussed what we are going to do when we finish 6 months [of chemotherapy]. Will consider putting her on TAMOXIFEN." Deft.'s App. at 24.
- September 18, 1989—"Her ERPR receptors initially positive ER at 62 and PR 117 because of that I think it is worthwhile giving her TAMOXIFEN 10 mg. b.i.d." Deft.'s App. at 27.
- October 24, 1989—"She continues on TAMOXIFEN 10 mg. b.i.d. for adjuvant therapy" Deft.'s App. at 27.

chart with Dr. Silberstein was entered on December 26, 1990—this is the last date Dr. Silberstein believes he saw Karen as a patient. With regard to tamoxifen, the December 26, 1990, progress note indicates:

> In regards to the TAMOXIFEN. She currently is on TAMOXIFEN and taking it only once a day. Her ER/PR is positive. I told her that I would slightly recommend that she continue on that though she wanted to discontinue the TAMOXIFEN because of her hot flashes. That would [ ][6] have been reasonable, since many oncologists do not give both chemotherapy and the TAMOXIFEN.

Defendant Fortis Insurance Company's Appendix in Support of Its Resistance to Plaintiffs' Motion for Summary Judgment and Defendant's Motion for Summary Judgment, Doc. No. 34, at 8 ("Deft.'s App."). Following December 1990, Dr. Hansen continued to renew Karen's original tamoxifen prescription initiated by Dr. Silberstein, and Karen remained on a daily tamoxifen regiment through 1996.[7] Dr. Hansen's progress notes throughout this time period contain numerous references to Karen's tamoxifen prescription and usage, for example:

- February 5, 1990—"The patient calls in stating she is on Tamoxifen, post CA of the breast." Plaintiffs' Appendix in Support of Motion for Summary Judgment, Doc. No. 18, at 140 ("Plf.s' App.").

- August 5, 1991—"In for recheck of her dysfunctional uterine bleeding related to her ~~Megace~~ [handwritten 'Tamoxifen'] therapy and recent treatment with Provera." Deft.'s App. at 9.

- November 19, 1991—"Patient is wondering about how much follow-up she should do at this point on her Tamoxifen therapy and post CA of the breast." Deft.'s App. at 10

- May 6, 1992—"She is on TAMOXIFEN 10mg bid." Deft.'s App. at 11.

- September 22, 1992 -"Her routine medication is Nolvadex." Deft.'s App. at 11.

- February 4, 1993—"Also is in for six month follow-up of her Tamoxifen . . . ."; "Also history of CA of the breast with Tamoxifen therapy." Plf.s' App. at 139.

- March 15, 1994—"She has questions concerning continuing Nolvadex, effects of lack of Estrogen on heart attack, bone disease, etc . . . . . Advised her that probably if economics of the medicine is not a problem she should continue on Nolvadex for another five years." Plf.s' App. at 139.

- December 18, 1995—"She is on Tamoxifen and Provera . . . . She takes no other medications." Deft.'s App. at 14.

- November 29, 1989—"She's on TEMOXIN (sic) 10 mg. bid." Deft.'s App. at 7, 26.

**6.** This sentence of the progress note actually reads: "That would *not* have been reasonable, since many oncologists do not give both chemotherapy and the TAMOXIFEN." Deft.'s App. at 8 (emphasis added). However, at Dr. Silberstein's deposition he indicated that upon reflection of the progress note, the first "not" was a dictation error and should be deleted in order for the statement to be correct. Plf.s' Supp.App. at 274–75.

**7.** The medical records indicate that Karen's use was almost, but not absolutely, continuous from November 1989 through 1996. For example, Dr. Hansen's progress note for July 18, 1991 indicates that Karen had "stopped her Tamoxifen this winter," though, according to the progress note, after discussing the importance of the tamoxifen therapy, Karen agreed to go back to taking the prescribed amount of tamoxifen per day. Deft.'s App. at 9.

- December 28, 1995—"She is presently on Tomixifen (sic). . . ." Deft.'s App. at 14.
- November 26, 1996—"She is on no medications." Deft.'s App. at 15.
- February 24, 1997—"States she did get her first period now a year after discontinuing her Tamoxifen." Deft.'s App. at 15.

Karen took tamoxifen for approximately seven years. Karen was not participating in a clinical trial at the time she used tamoxifen.

Dr. Hansen's medical records in the years following Karen's mastectomy and chemotherapy treatment contain numerous references to her history of breast cancer, for example:

- May 6, 1992—"She does have a history of CA of the right breast with mastectomy. She does routine follow-up with mammograms, chest x-ray and blood work." Deft.'s App. at 11.
- February 04, 1993—"Also history of CA of the breast with Tamoxifen therapy." Plf.s' App. at 139.
- August 11, 1993—"This patient is having CBC, diagnostic, free T4 and serum iron levels drawn for routine followup of her metastatic CA of the breast." Plf.s' App. at 139.
- December 18, 1995—"History of CA of the right breast with mastectomy." Deft.'s App. at 14.
- June 16, 1996—"History of cancer of the breast." Deft.'s App. at 14.

On two occasions, the references to Karen's history of breast cancer in Dr. Hansen's progress notes is more involved. The first is the progress note of November 19, 1991, which reads:

> Patient is wondering about how much follow-up she should do at this point on her Tamoxifen therapy and post CA of the breast. Did talk to Dr. Ryan. She needs a CBC and platelet count quarterly. Needs a diagnostic chem panel and chest x-ray annually. Of course, she should come in with any symptoms at any time.

Deft.'s App. at 10. The second is on March 15, 1994, when Karen visited Dr. Hansen to discuss her five-year survivalship:

> The patient is in basically to discuss her five year survivalship of her CA of the breast. She has questions concerning continuing Nolvadex, effects of lack of Estrogen on heart attack, bone disease, etc. Did discuss her case with Dr. Bate and then sat down and discussed it with the patient. Advised her that probably if economics of the medicine is not a problem she should continue on Nolvadex for another five years. It does have cholesterol lowering and protective benefits as well as protection from osteoporosis. Did recommend a yearly mammogram and yearly blood work but otherwise don't think she needs any other followup at this time.

Plf.s' App. at 139. Karen's medical records also indicate that in the years following her mastectomy and chemotherapy treatment, she had the following procedures performed: (1) twelve blood panels[8]; (2) ten blood chemistry analyses[9]; (3)

---

8. The blood panels were performed on April 3, 1990; July 31, 1990; November 13, 1990; June 12, 1991; August 6, 1991; November 26, 1991; February 19, 1992; May 6, 1992; August 19, 1992; February 4, 1993; September 28, 1993; and December 13, 1994. Deft.'s App. at 50–61; Defendant Fortis Insurance Company's Statement of Material Facts in Support of Motion for Summary Judgment and in Resistance to Plaintiffs' Motion for Summary Judgment, Doc. No. 32, at ¶ 77 ("Deft.'s Statement of Material Facts").

9. The chemistry testing was performed on January 5, 1990; April 3, 1990; July 31,

three bone scans[10]; (4) four chest x-rays[11]; and (5) eleven mammograms[12] of the contralateral breast.

In addition to the progress notes generated by Karen's visits to Dr. Hansen in the years following her mastectomy and chemotherapy treatment, the record contains a medical record from the Mason City Clinic dated February 14, 1997. This document is classified as a "Progress Note" and was authored by Betty Krones, RN OBG, nurse to Dr. Faust. From the context of the record, Karen appears to have contacted Dr. Faust's office, and spoke with Nurse Krones, about gynecological concerns. In part, the record provides the following:

> Karen is a new patient to our office. In 1989 she had breast cancer which was treated with mastectomy and chemotherapy. She was on TAMOXIFEN and PROVERA but discontinued it in April 1996. Her hot flashes have since decreased. However, since February 9, 1997, she has been bleeding the last 3 days.... She is worried about her risk of cancer because the breast cancer was estrogen feed. She wonders what Dr. Faust would recommend for her. I consulted with Dr. Faust. He advises he would like to see her on his call day next week to talk to her about her cancer risk. In the meantime, he recommends if she would like she can stop by the office and check a hemoglobin to make

sure that she is not severely anemic.... Patient voiced understanding and agreed to this plan. At this time she has declined to come in for a hemoglobin. She will monitor the symptoms and call back as needed. Otherwise, keep her appointment here next week. Appointment was scheduled for February 21, 1997.

Deft.'s App. at 28. There are no medical records in the record establishing that Karen, in fact, showed up for the February 21, 1997, appointment with Dr. Faust.

In August 2002, Karen was seen in the Hereditary Cancer Prevention Clinic at Creighton University in Omaha, Nebraska "for evaluation and counseling related to her risk for hereditary breast ovarian cancer." Plf.s' App. at 241. Given Karen's own breast cancer at age 35, and the fact that her sisters and mother had experienced either breast or ovarian cancer, Karen underwent genetic testing to determine whether she had a BRCA1/2 mutation. *Id.* Genetic testing revealed that Karen did have a BRCA 1 mutation, putting her at a high risk of cancer in the contralateral breast and ovarian cancer. *Id.;* see Defendant Fortis Insurance Company's Second Supplemental Appendix, Doc. No. 63, at 181, 192–93 (indicating that Karen had tested positive for the BRCA 1 mutation) ("Deft.'s Second Supp.App."). In light of testing positive for the BRCA 1 mutation,

---

1990; November 13, 1990; June 12, 1991; August 6, 1991; August 19, 1992; February 4, 1993; September 28, 1993; and December 13, 1994. Deft's App. at 62–72; Deft.'s Statement of Material Facts at ¶ 78.

**10.** The bone scans were performed on April 5, 1989; May 9, 1990; and May 27, 1992. Deft.'s App. at 29–30, 161; Deft.'s Statement of Material Facts at ¶ 79.

**11.** The chest x-rays were performed on August 6, 1991; August 19, 1992; December 21, 1993; and December 18, 1995. Deft.'s App.

at 46–49; Deft.'s Statement of Material Facts at ¶ 80.

**12.** Karen underwent mammograms of the contralateral breast on March 13, 1990; May 16, 1991; November 26, 1991; December 15, 1992; December 21, 1993; December 13, 1994; December 18, 1995; December 30, 1996; December 22, 1997; December 28, 1998; and December 27, 2000. Deft.'s App. at 32–45; Deft.'s Statement of Material Facts at ¶ 81.

in January 2003, Karen consulted with Dr. Thoo H. Tan, D.O., at the Hampton Clinic, and Dr. Harsha U. Jayawardena, M.D., at the Mason City Clinic, about a prophylactic mastectomy of the left breast and a prophylactic hysterectomy. Deft.'s Second Supp.App. at 181, 192–93. Both Dr. Tan and Dr. Jayawardena agreed that due to her breast cancer history and positive test for the BRCA 1 mutation that the prophylactic mastectomy and hysterectomy should be scheduled.[13]

### 3. The search for health insurance

#### a. Initial contact with Midwest Benefits

As described above, in the summer of 2001 the Schmidts were in search of replacement health insurance so that Daniel could transition out of his job with the Hampton–Dumont Community School District, and into a position as an active co-owner of the various businesses owned by the Schmidts. On the advice of the school superintendent, Dr. Lee Morrison, Karen contacted the school district's insurance agent, Loren Kiel ("Kiel"). In 2001, Kiel was the president of Midwest Benefits, Inc. ("Midwest Benefits"), in Decorah Iowa. Kiel was also affiliated with Group Benefits Consultants, Inc., a company which handled third party administration of retirement plans, self-funded group health plans, and flexible benefit plans. Kiel has been involved in the insurance business since 1984 and is licensed to sell life, accident and health insurance in Iowa. In 2001, Kiel worked with an assistant, Karla Baumler ("Baumler"). At that time, Baumler had obtained her insurance license for health care products, and worked on individual quotes and applications, small group quotes and applications, and some customer service work. Deft.'s App. at 133; Plf.s' App. at 24.

Karen first contacted Midwest Benefits by telephone sometime in June 2001. Karen discussed the fact that Daniel was intending to leave his employment with the school district and transition into co-ownership of their small businesses, and that hopefully this transition would be complete by the time the sale of the Hampton Home Store to the Schmidts was finalized. Karen also indicated that Daniel's transition was contingent on the Schmidts obtaining replacement health insurance coverage as close to the closing date on the Hampton Home Store sale as possible. Given Karen's history of breast cancer, described in detail above, she was concerned over whether they would be able to obtain health insurance coverage.

After her initial contact, Karen conversed with Kiel and Baumler on a number of occasions before any application for insurance was submitted. According to Kiel, the conversations were generally about "what the benefits were of the various plans that were available and the different . . . . deductibles and premium rates and so forth for each plan, somewhat about how that compared to current coverage that they had under the group plan, what might be good, in terms of coverage." Plf.s' App. at 6. Other than a comparison of the options available, another key topic of conversation was Karen's concern over obtaining coverage due to her breast cancer history. *See id.* ("we talked about— The concern was about the prior history back a number of years"). The parties agree that Karen told Kiel and Baumler that she had breast cancer and a mastectomy in 1989—however, what additional details, if any, Karen told Kiel and Baumler about her medical history is hotly contested by the parties.

---

**13.** The record does not indicate whether these procedures were, in fact, performed.

### b. Life Investors application

Kiel recommended that the Schmidts first submit an application for health insurance coverage to Life Investors Insurance Company of America ("Life Investors"). Kiel recommended Life Investors first because he felt it offered the best coverage, was a quality company, had the best rates, and was most likely to offer coverage to someone who had a past medical history. Deft.'s App. at 146; Plf.s' App. at 6. On the advice of Kiel, the Schmidts decided to submit an application to Life Investors. In preparation for the submission of the Life Investors application, Karen compiled some of her medical records surrounding her cancer treatment and provided them to Kiel and Baumler. *See* Deft.'s App. at 150 ("On the advice of Karla and Loren together, and talking with them, we decided that the best would be for me to get the medical records and a letter from my doctor saying I had these conditions and send them in with the application."). While these records were not exhaustive, they did contain portions of Dr. Silberstein's progress notes, portions of Dr. Hansen's progress notes, some mammogram results, and some blood test results. *See* Deposition Exhibit 4, Plf.s' App. at 132–202. Karen also procured a letter from Dr. Hansen for submission with her application which reads:

> To Whom It May Concern:
>
> [Karen Schmidt] has been under my care since 1973. She has a significant history of breast cancer with mastectomy in 1989. She has done well since that time and has not had any evidence of recurrence. She has had regular and routine check-ups and follow-ups and now 12 years post disease is considered

to be disease free. Other than the above, the patient has no significant medical history and is an extremely healthy woman for her age, and has no health risks.

> If there are any questions in regard to the above, please feel free to contact me.

Plf.s' App. at 134. The letter is dated July 17, 2001, and is signed by Dr. Hansen.

Sometime in July 2001, Midwest Benefits mailed the Life Investors application to Karen and Daniel to fill out. The Schmidts filled out, signed and dated the Life Investors application on July 26, 2001, and mailed it back to Midwest Benefits with a packet of Karen's medical records and the July 17, 2001, letter from Dr. Hansen. On the application, Karen and Daniel checked "Yes" in response to Questions 2(k), which asked: "Has any person listed in question number 1 **EVER** had or to the best of your knowledge now have: . . . Disorder of skin, cyst, tumor or any cancer?" Plf.s' App. at 121. In the following section which required details regarding "yes" answers, the Schmidts identified Karen as the family member associated with the "yes" answer to Question 2(k), and there is a handwritten notation to "see Dr's reports attached" where it asks for details. Plf.s' App. at 122. Karen and Daniel also checked "Yes" in response to Question 4(a) which asked: "Has anyone above, within the past 5 years: . . . Had a check-up, consultation, lab test, illness, injury, surgery?" In the section that asks for details, the Schmidts again identified Karen as the family member associated with the "yes" answer, and in the box for providing details wrote "yearly mamogram (sic)—see attached reports." *Id.* Dr. Hansen's July 17, 2001, letter and *at least*[14]

---

14. Kiel testified that he could say for certain that two pages of progress notes and Dr. Hansen's July 17, 2001 letter were submitted with the Life Investors application, that he usually sends all progress notes with an application but wasn't certain if the progress notes other than the two pages identified were sent and was also uncertain as to whether any of

some of the progress notes contained in medical records Karen provided were attached by Kiel and/or Baumler and submitted along with the Life Investors application. Plf.s' App. at 7, 17, 26. Baumler testified that this additional documentation was submitted because the application asked if any proposed insured had *ever* had cancer and asked for details regarding her cancer history. *See* Plf.s' App. at 26 ("they asked if she ever had anything. She had to answer that. That's why we included all of that information.").

Around the time the Life Investors application was submitted, approximately the end of July 2001, Kiel informed Karen of the Gramm–Leach–Bliley Financial Services Modernization Act ("Gramm–Leach–Bliley Act") and provided her with some written information regarding the Gramm–Leach–Bliley Act. Deft.'s App. at 153–54. After reviewing the information, Karen composed a letter to Life Investors which read:

> To Whom It May Concern:
>
> As provide (sic) by the Financial Services Modernization Act/Gramm–Leach–Bliley, we request that any information provide (sic) by us to your company in regards to our application for health insurance **NOT** be forwarded to any Medical Information Bureau.
>
> Furthermore, we request that any and all information Life Investors compiles in regards to our application **NOT** be forward (sic) to any Medical Information Bureau as provided in the same Financial Services Modernization Act/Gramm–Leach–Bliley.

> Thank you for your consideration of this matter.

Plf.s' App. at 130 (emphasis in original). The letter is dated July 24, 2001,[15] and is signed by both Karen and Daniel Schmidt. Karen prepared the letter in an attempt to prevent dissemination of the medical records she submitted along with the Schmidts' application to entities other than Life Investors. Def.'s App. at 154.

Kendy Robinson, of the Health Service Unit at Live Investors, sent Kiel a letter dated August 10, 2001, regarding the underwriting status of the Schmidts' application. It is characterized as an "Agent Action Report" and states:

> For Your Action:
> - Karen will be denied due to health history of Breast cancer.
> - Shall we continue?
> - This is your second request.
>
> Comments: Certificate will be pending until information is received.

Plf.s' App. at 118. Kiel does not recall when this letter was received. On August 28, 2001, Baumler sent a fax to Linda Smith of the Health Service Unit at Live Investors. The fax stated:

> Please discontinue the request for a new individual policy on Daniel Schmidt and daughter Kathy..... This application was sent in and due to Daniel's spouse Karen being denied the whole family has decided to get a policy elsewhere. If you have questions, please call.

Plf.s' App. at 117. In a letter sent to Daniel, dated August 30, 2001, Life Investors acknowledged that it had been

---

the other medical records provided by Karen (i.e. mammogram results, blood panel results) were sent with the application. Plf.s' App. at 17–18. On the other hand, Baumler testified that "[t]he whole packet of [medical records] that Karen had sent" was submitted with the Life Investors application. Plf.s' App. at 26.

**15.** In spite of the date on the letter, it is unclear from the record whether the letter was actually sent on July 24, 2001, or whether it was ever received by Life Investors.

advised of his request to withdraw his application and stated that it had ceased evaluation of the Schmidts' application for insurance as requested. Plf.s' App. at 119.

### c. Fortis application

Sometime after Kiel and Karen became apprised that there was a problem with the Life Investors application, it was decided that the Schmidts should submit an application for health insurance to Fortis Insurance Company ("Fortis"). Part of the rationale behind submitting an application to Fortis was the fact that the application only asked for medical history for the past ten years. Deft.'s App. at 135; Plf.s' App. at 27. The Fortis application required the Schmidts to check "Yes" or "No" in response to the following question:

**WITHIN THE LAST 10 YEARS HAS ANY PROPOSED INSURED:**

**18. HAD ANY DIAGNOSIS OF, RECEIVED TREATMENT FOR, OR CONSULTED WITH A PHYSICIAN CONCERNING:** ....

k) Cancer? Provide location, type of cancer and treatment received.

Plf.s' App. at 81. Karen had a number of conversations with Kiel and Baumler regarding how this question should be answered. Regarding the conversations over how Question 18(k) should be answered, Kiel testified as follows:

Q: Okay. Did you talk with Karen about how to fill out the health questionnaire and specifically question 18K?

A: I think we talked about it some—at some length about the entire application, that anything within the last ten years should be reported, but not anything— It's not asking for anything older than ten, so I don't recall if we talked about just one item or the whole thing.

Q: Did the issue about Karen's health history, though, come up, in terms of—

A: Yes.

Q: —how to approach the Fortis application?

A: Yes.

Q: Okay. Did she ask for your input on how to complete it?

A: She may have. She may have. We might have talked, because of the prior condition, talked about that should or what should be put down and what was not necessary to put down.

Q: Did you advise Karen that she could answer no to that cancer inquiry on the Fortis application? ....

A: Well, let me answer that question in general.

It was my understanding, from what I had seen of the medical records and what Karen and I had talked about, that she was not being treated for cancer in the last ten years, had not had that condition, was not—was in good health, as indicated by her doctor.

And therefore, the question's asked, as asked on the application, which says, in the last ten years, she could very truthfully put down as being—the answer being no.

Q: And you believe that her—based on what you knew, that she was answering the question truthfully?

A: Yes....

Q: And did you advise her of such? ....

A: As to the information that I was— that I knew about and from our discussions, I felt absolutely the answer that she put down was correct.

Plf.s' App. at 11. As to conversations with Karen about how to fill out Question 18(k), Baumler testified as follows:

A: ....To me, that application was asking, have you been treated for, anything in the last ten years? She had not been.

I mean, in talking to her, and the information she had, to me, it was very clear that she answered the question to the best of her knowledge and correctly.....

　　*　　*　　*　　*　　*　　*

Q: Did you talk to Loren about the Tamoxifen issue?

A: Uh-huh.

Q: Before the [Fortis application] packet went out?

A: Uh-huh.

Q: And what did you and Loren talk about relative to Tamoxifen?

A: We basically talked about the same thing that Karen and I talked about. I mean, I remember going back and forth. And it's like, okay, you know, how would you answer [Question 18(k)]? And we both agreed that, I mean, within the last ten years, she had not been taking anything for treatment.

I mean, if I would have been filling out the application, I would have done, filled it out the same way she did, I mean.

Plf.s' App. at 28–29. In regard to her consultation with Kiel and Baumler regarding the correct response to Question 18(k), Karen testified as follows:

Q: So the focus of these five conversations [with Kiel and Baumler] was how to answer the question, within the last ten years, has any proposed insured had any diagnosis or received treatment for or consulted with a physician concerning cancer?

A: Yes.

Q: Okay. Tell me, as best you can recall, what was discussed in that regard.

A: What was discussed was the fact that I had breast cancer in 1989. I had a mastectomy very shortly thereafter. I was cancerfree at that time. After the mastectomy, I received chemotherapy in an adjuvant setting, and I took Tamoxifen as a preventative medication.

Q: Anything else that you recall being discussed in those five conversations prior to completion of [the Fortis application]?

A: It was extensive discussion about the fact that I had breast cancer, that I took Tamoxifen as a preventative medication and the chemotherapy.

Q: Tell me what—Do you recall the specifics of those conversations?

A: That I wanted to make sure that we answered the question correctly, that I had given careful consideration to it, and that I wanted them to assure me that they had also. And did I answer the question correctly? Am I answering correctly? And their response was yes.

　　*　　*　　*　　*　　*　　*

Q: Did they express, and by them I mean Loren and/or Karla, express any concerns or questions as to how question 18K should be filled out?

A: Question 18K was given careful consideration by Loren, Karla and myself. And after the discussions that we had in regards to my health history, all three of us agreed that we had—that the answer to question [18]K was no.

Deft.'s App. at 157–58.

Baumler mailed a Fortis individual medical insurance application to Karen on August 8, 2001. Daniel and Karen Schmidt completed and signed the application on August 9, 2001 and mailed the application back to Midwest Benefits. The Schmidts checked "No" in response to Question 15, which asked: "Have any of the proposed insureds ever been declined, postponed, charged an extra premium or had a portion of coverage excluded for life, disability, or medical insurance or had such coverage rescinded?" Plf.s' App. at 80. In

response to Question 18(k), the Schmidts also checked "No." Plf.s' App. at 81. The Schmidts left page 5 of the application, which allotted space for applicants to provide additional medical details, blank. Plf.s' App. at 83. Karen did not have any discussions with Kiel or Baumler as to whether to provide additional medical details on page 5 of the Fortis application. Deft.'s Statement of Material Facts at ¶ 56. At the end of the application, directly above the signature block where the Schmidts signed and dated the application, the following appears:

> **I represent to the best of my knowledge and belief, that all statements and answers on this enrollment form are complete and true. The enrollment form and any amendments shall be the basis for the contract. I also agree that: . . . .**
>
> We, the undersigned Proposed Insured(s) and agent acknowledge that the Proposed Insured(s) has read the completed enrollment form. We understand and acknowledge that any fraudulent statement or material misrepresentation on the enrollment form and/or any amendments may result in claim denial or contract rescission, subject to the time limit on certain defenses or incontestability provisions of the contract.

Plf.s' App. at 84. Kiel signed the portion of the Fortis application "no" where he was asked if he was aware of any mental or physical disease or deformity of any proposed insured which was not disclosed on the enrollment form. Plaintiffs' Statement of Material Undisputed Facts in Support of Their Motion for Summary Judgment, Doc. No. 18, at ¶ 46.

The application was subsequently mailed by Baumler to Fortis on August 13, 2001. The packet of medical records that Karen provided to Midwest Benefits, and that had been submitted with the Life Inves-

tors application, was not submitted with the Fortis application. Deft.'s Statement of Material Facts at ¶ 60. There is a dispute as to whether Dr. Hansen's July 17, 2001, letter was submitted with the Fortis application. Fortis notified Midwest Benefits that coverage had been extended to the Schmidts in a correspondence dated August 20, 2001. The policy that Fortis issued to the Schmidts had an effective date of September 1, 2001.

### 4. *Fortis's rescission*

As discussed above, in August 2002, Karen went to the Hereditary Cancer Prevention Clinic at Creighton University in Omaha, Nebraska in order to undergo genetic testing to determine if she had a BRCA1/2 mutation. Dr. Henry Lynch, M.D., the physician overseeing Karen's genetic testing, wrote Fortis a letter dated August 13, 2002, requesting preauthorization for the proposed testing. Amongst other information, the letter noted that "Karen has a history of breast cancer at 35." Plf.s' App. at 241. Receipt of this letter by Fortis triggered an investigation in Karen's medical history. In a letter dated September 14, 2002, and addressed to Daniel Schmidt, Fortis indicated that it had received a statement of expense from Dr. Hansen, and indicated that more information regarding Karen's medical history would be necessary before Fortis's liability could be determined. In the letter, Fortis asked that Karen provide the name and address of any doctors or hospitals by who she had been treated in the past 11 years, and the name and address of any pharmacies where she purchased prescription medication within the past 11 years. Plf.s' App. at 243. In addition, Fortis asked Karen to sign a medical records release. LeeAnn Szopinski, Senior Individual Medical Underwriter for Fortis, wrote the following letter, dated March 12, 2003, to the Schmidts:

During the course of your recent claim for benefits under the above policy, we received information regarding Karen Schmidt. This prompted a review of Karen's medical history and medical records were obtained from Dr. Hanson. In reviewing these medical records, we discovered medical information that was not disclosed on your application for insurance. As you know, at the time you applied for coverage, we asked you to complete an application/enrollment form. Karen's eligibility for insurance coverage with our company was based on the information included in the application/enrollment form. We found misrepresentation on questions (sic) 18K of the application/enrollment form. Had our Underwriting Department been aware of this medical history at the time the application/enrollment form was approved, Karen's eligibility for insurance coverage with our company would have been affected.

In light of this additional information, the following adverse action would have been required at the time that your policy was issued. We are enclosing an Amendment of Application that excludes coverage for Karen Schmidt from the effective date of the policy.

If you choose to accept the above Amendment of Application, please sign, date and return it to Fortis in the enclosed envelope. Your policy will remain in force, limited by the Amendment of Application.

If you choose not to accept and sign the Amendment of Application, you will leave us no alternative except to rescind the **entire** policy back to the effective date of September 1, 2001. *We require notification within 30 days of receipt of this letter of your intentions.* Fortis will arrange for any appropriate refund of premium, less any claims, which may have already been paid.

If you have any **new information** that may impact this decision please submit this information in writing.

Plf.s' App. at 244–45 (emphasis in original).

At this point the Schmidts obtained counsel,[16] through whom they appealed this decision internally with Fortis and filed a complaint with the Iowa Insurance Commissioner. *See* Plf.s' App. at 67–68. Karen then procured letters from both Dr. Silberstein and Dr. Hansen for submission to Fortis in conjunction with their appeal. Dr. Silberstein's letter was dated March 24, 2003, and stated, in relevant part:

Karen Schmidt had a right modified mastectomy in March of 1989 for medullary carcinoma of the right breast with 1/18 lymph nodes positive for metastatic carcinoma.

She was treated with chemotherapy (Adriamycin, Cytoxan and 5–FU) in an adjuvant setting. After that she received tamoxifen. Tamoxifen, at that point in time, was a preventative prophylactic measure to prevent cancer from[ ]recurring; but it was not an active treatment for cancer since this was given in an adjuvant setting with no evidence that she had any cancer.

Plf.s' App. at 69, 230. Dr. Hansen's letter was dated April 2, 2003, and stated, in relevant part:

[Karen Schmidt] has been under my care since 1973. In 1989 she was diagnosed with breast cancer, underwent a mastectomy with adjuvant therapy and radiation. Later that year when she was under the joint care of Dr. Peter

Plf.s' App. at 247.

---

**16.** At this time, the Schmidts were represented by Michael J. Cross of Hampton, Iowa. *See*

Silberstein, oncologist, and myself, discussions were held about Tamoxifen for prophylactic purposes. According to my records and recollection Dr. Silberstein thought it was important that she go on Tamoxifen as prophylaxis.

To the best of my knowledge this patient has had no active diagnosis or treatment for any cancer following surgical and radiation treatment in 1989. She has been cancer-free in the interval. The Tamoxifen she was on for seven years was purely as a prophylaxis. It was discontinued at that time as studies came out showing that there was no benefit to using it for more that five years.

Therefore, to the best of my knowledge and my records Tamoxifen was prescribed for this patient, who was deemed to be cancer-free, as a prophylactic measure due to her history of breast cancer only....

Plf.s' App. at 70, 231. After learning of Fortis's decision to rescind the policy, Kiel also faxed Fortis a handwritten letter which indicated that Karen had not been treated for cancer during the relevant ten-year period, and that she had only taken preventative measures during that time—therefore, on these basis, Kiel requested a reversal of Fortis's decision to rescind the policy. Plf.s' App. at 72.

A May 22, 2003, letter from Michael Prudlow, Individual Medical Underwriting Correspondent for Fortis, to counsel for the Schmidts, indicated that "[a]fter careful review, we find that our actions have been appropriate." Plf.s' App. at 247. The letter states the basis for Fortis's decision as follows:

Despite the fact that Ms. Schmidt's diagnosis and primary treatment occurred in 1989, she did continue the use of Tamoxifen until 1995. Additionally, Ms. Schmidt underwent follow-up visits with the doctor(s) to be screened for any recurrence of the cancer, well after 1989. The Enrollment Form completed by the Schmidts asks: *"Within the last 10 years has any proposed insured: Had any diagnosis of, received treatment for, or consulted with a physician concerning:"* The Schmidts answered "no" to all of the health statement questions despite the fact that Ms. Schmidt took prescription medication and underwent follow-up exams within the ten years prior to the application date. Had we been aware of this information at the time of application, an offer of coverage would not have been extended to Ms. Schmidt.

*Id.* (emphasis in original). A June 2, 2003, letter from Margaret Chase ("Chase"), Market Conduct Analyst for Fortis, to the Iowa Insurance Commission indicates the following as the basis for Fortis's decision:

The Enrollment Form completed by the Schmidts asks: *"Within the last 10 years has any proposed insured: Had any diagnosis of, received treatment for, or consulted with a physician concerning:"* The Schmidts answered "no" to all of the health statement questions on the Enrollment Form.....

On or about February 19, 2003, a routine claims investigation was conducted. As a result, medical records were requested from Dr. Peter Silberstein and Dr. Keith Hansen. These records indicate that Mrs. Schmidt was diagnosed with breast cancer in 1989. A further review of these records documents the fact that Ms. Schmidt took prescription medication (Tamoxifen) and underwent follow-up exams for cancer within the ten years prior to the application date. Had we been aware of this information at the time of application, an offer of coverage would not have been extended to Ms. Schmidt.....

After careful review of this matter, we find that our actions have been appropriate.

Plf.s' App. at 249–50. A second letter from Chase to the Iowa Insurance Commissioner, dated June 19, 2003, states, in part:

Enclosed, please find copies of Ms. Karen Schmidt's medical records. The highlighted areas pertain primarily to question 18k which asks: *Within the last 10 years has any proposed insured: 18. Had any diagnosis of, received treatment for, or consulted with a physician concerning: k. "Cancer? Provide location, type of cancer and treatment received."* The medical records indicate that Ms. Schmidt consulted with a physician and received treatment with Tamoxifen until 1995. Based on our underwriting guidelines, an offer of coverage would not have been extended.

Plf.s' App. at 251.

A September 12, 2003, letter from Michael Prudlow to the Schmidts' counsel [17] stated, in pertinent part:

According to [Dr. Silberstein and Dr. Hansen], Ms. Schmidt was prescribed Tamoxifen as a prophylaxis to prevent the recurrence of cancer. While this is true, it should also be considered that had Ms. Schmidt not had cancer, she would not have been prescribed Tamoxifen. This medication is commonly used by breast cancer survivors due to the frequency of recurrence.

While annual mammograms may be part of a routine exam, it is also true that these are more urgent for those women with a history of breast cancer. Ms. Schmidt's exam results were certainly reviewed with her history of cancer taken into consideration as her doctors were aware of this history.

Please refer to the Other Provisions page of the certificate, specifically the paragraph regarding Misstatements. As the certificate indicates, "if any relevant fact about you is found to have been misstated, the true facts will be used to determine if the insurance is in force." This paragraph is applicable to question 18k regarding Ms. Schmidt's health history. Furthermore, the final paragraph on page 6 of the enrollment form states:

*"We, the undersigned Proposed Insured(s) and agent acknowledge that the Proposed Insured(s) has read the complete enrollment form. We understand and acknowledge that any fraudulent statement or material misrepresentation on the enrollment form and/or any amendments may result in claim denial or contract rescission, subject to the time limit on certain defenses or incontestability provisions of this contract.*

The decision to review additional medical information via medical records is based upon the history as provided by the applicants. If an application provides a "clean" or uneventful medical history, an offer of coverage is extended as the applicant has attested to the fact that the information they have provided is complete and accurate.

Applicants are not expected to have knowledge of what the company underwriting guidelines are. They are expected to provide a complete and accurate personal health history to be reviewed and considered for an offer

---

17. At this point in time, the Schmidts were represented by attorney Chad A. Swanson, of Dutton, Braun, Staack & Hellman, P.L.C. in Waterloo, Iowa. *See* Plf.s' App. at 253; Plf.s' Statement of Material Facts at ¶ 102. Mr. Swanson continues to represent the Schmidts today.

of coverage. There are no guarantees of coverage as all applications for major medical insurance are fully underwritten.

As stated in our prior correspondence of August 6, 2003, if the amendment agreeing to remove Ms. Schmidt is not signed and returned, the entire policy will be rescinded back to its original effective date. This deadline has been extended since May 30, 2003 and will not be extended any longer. Since the amendment has not been returned, we will proceed with the rescission of Mr. and Ms. Schmidt's policy. They will receive an entire refund of their premiums, less any claims paid.

Plf.s' App. at 253–54. In a September 22, 2003, letter to Daniel Schmidt, Fortis notified him of the rescission of the Schmidts' entire health insurance policy/certificate back to the effective date of September 1, 2001. Plf.s' App. at 255. A separate correspondence from Fortis to Daniel, also dated September 22, 2002, indicates that the policy was terminated effective September 1, 2001, as there had been no response to Fortis's reformation offer. Plf.s' App. at 75. Included in this second correspondence was a check in the amount of $7,365.97, which represented all premiums paid by the Schmidts minus all claims paid by Fortis. *Id.*

### 5. Summary of factual disputes

There are three general areas of factual dispute in the record that the court will summarize here merely for purposes of clarification and focus. First, there is a factual dispute as to Kiel's knowledge, if any, of Karen's tamoxifen usage prior to submission of the Fortis application. Second, there is a factual dispute as to whether Karen's tamoxifen usage constituted treatment for cancer and whether her follow-up examinations (i.e. mammograms, blood panels, chest x-rays, and five-year

survivalship appointment) constituted consultation with a physician regarding cancer. Finally, there is a factual dispute surrounding whether or not Karen had been actually denied coverage by Life Investors at the time the Schmidts answered and submitted their Fortis application. The court will discuss each of these disputes, including whether the dispute generates a genuine issue of material fact, in greater detail in the legal analysis section.

### B. Procedural Background

On September 29, 2003, the Schmidts filed suit against defendant Fortis in the Iowa District Court in and for Franklin County. The plaintiffs' petition, entitled "Petition for Declaratory Judgment," contained two counts. The first count sought declaratory judgment that the Schmidts made no fraudulent misrepresentations on the Fortis enrollment form and that Fortis was not entitled to fully or partially rescind the policy. *See* Petition for Declaratory Judgment, Doc. No. 1, Exh. B. The second count alleged breach of contract, asserting that Fortis's unlawful rescission of the policy had caused economic damage to the plaintiffs in that the plaintiffs have had to pay for various medical services and prescription drugs for which Fortis is liable under the unlawfully rescinded health insurance policy. *Id.*

On November 6, 2003, Fortis removed the action to this court on the basis of diversity jurisdiction under 28 U.S.C. § 1332, as the plaintiffs are residents of Hampton, Iowa, and Fortis is a Wisconsin corporation with its principal place of business in Wisconsin, and as the amount in controversy exceeded the $75,000.00 jurisdictional amount. (Doc. No. 1). On November 18, 2003, Fortis filed an Answer and Counterclaim in which it categorically denied that the plaintiffs were entitled to the relief sought, and asserted a counter-

claim for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the plaintiffs made fraudulent misrepresentations or fraudulently concealed material information on the enrollment form and that Fortis had the legal right to rescind the policy. (Doc. No. 5). The plaintiffs filed an Answer to Counterclaim on December 8, 2003, in which they denied the allegations in Fortis's counterclaim and again requested declaratory judgment that they made no fraudulent misrepresentation on the enrollment form and that Fortis therefore had no right to rescind the policy. (Doc. No. 7).

On May 28, 2004, the plaintiffs filed their Motion for Summary Judgment. (Doc. No. 18). On August 16, 2004, Fortis filed a Motion for Summary Judgment. (Doc. No. 32). On August 18, 2004, Fortis filed its Resistance to Plaintiffs' Motion for Summary Judgment. (Doc. No. 38). Attached to both Fortis's Motion for Summary Judgement, and Resistance to Plaintiffs' Motion for Summary Judgment, was a Combined Brief In Resistance to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment. *See* Doc. Nos. 32 & 38. On August 23, 2004, the plaintiffs filed their Local Rule 56.1(d) Reply to Defendant's Statement of Material facts. (Doc. No. 41). On September 24, 2004, the plaintiffs filed their Resistance to Defendant's Motion for Summary Judgment (Doc. No. 50), to which they attached their Supplemental Appendix in Support of Plaintiffs' Motion for Summary Judgment and in Resistance to Defendant's Motion for Summary Judgment, as well as a Supplemental Statement of Additional Material Facts in Support of Plaintiffs' Motion for Summary Judgment and in Resistance

to Defendant's Motion for Summary Judgment. *See* Doc. No. 50. On October 4, 2004, Fortis moved to file under seal[18] its Reply Brief in Support of Fortis Insurance Company's Motion for Summary Judgment (Doc. No. 62), its Local Rule 56.1(d) Reply to Plaintiffs' Supplemental Statement of Additional Material Facts (Doc. No. 63), and a Second Supplemental Appendix (Doc. No. 63). Fortis's motion to file these documents under seal was granted, and the documents were so filed. *See* Doc. No. 65. On December 20, 2004, the plaintiffs filed a Second Supplemental Appendix. (Doc. No. 72).

Telephonic oral argument on the cross-motions for summary judgment was held on December 21, 2004. At oral argument the plaintiffs were represented by Chad A. Swanson of Dutton, Braun, Staack & Hellman, P.L.C., in Waterloo, Iowa. Fortis was represented by Michael W. Thrall and Debra L. Hulett of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in Des Moines, Iowa. Counsel for both parties did an exceptionally competent and professional job in briefing and arguing their respective positions to the court. A bench trial on this matter is currently scheduled for January 24, 2005, in Fort Dodge, Iowa.

## II.  LEGAL ANALYSIS

### A.  Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 in a number of prior decisions. *See, e.g., Kaydon Acquisition Corp. v. Custum Mfg., Inc.,* 301 F.Supp.2d 945, 952 (N.D.Iowa 2004); *Wells Dairy, Inc. v. Travelers Indemnity Co. of*

---

**18.** The basis for filing the documents under seal was that certain information contained in the documents was covered by the Protective

Order for Rule 30(b)(6) Deposition of Life Investors signed by Magistrate Judge Paul A. Zoss on August 17, 2004. (Doc. No. 36).

*Illinois,* 241 F.Supp.2d 945, 958–59 (N.D.Iowa 2003); *Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird·v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); · *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir. 2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim .... is asserted .... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same). A case in which the issues involved are primarily questions of law "is particularly appropriate for summary judgment." *TeamBank, N.A. v. McClure,* 279 F.3d 614, 617 (8th

Cir.2002) (citing *Adams v. Boy Scouts of America–Chickasaw Council,* 271 F.3d 769, 775 (8th Cir.2001)); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Shirley,* 96 F.3d 1108, 1111 (8th Cir.1996) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1315 (8th Cir.1996) (same). With these standards in mind, the court turns to consideration of the parties' cross-motions for summary judgment.

### B. Equitable Rescission

#### 1. Generally

██ Under Iowa law, fraudulent misrepresentation in the inducement to contract gives rise to three distinct actions: (1) a cause of action at law for money damages; (2) a defense to a breach-of-contract claim; and (3) a ground for rescission of a contract in an action in equity. *See Gunderson v. ADM Investor Serv., Inc.,* 85 F.Supp.2d 892, 919 (N.D.Iowa 2000); *Oeltjenbrun v. CSA Investors, Inc.,* 3 F.Supp.2d 1024, 1050 (N.D.Iowa 1998); *Utica Mut. Ins. Co. v. Stockdale Agency,* 892 F.Supp. 1179, 1191 (N.D.Iowa 1995). In this instance, the case at hand concerns whether Fortis's rescission of the policy based on an alleged fraudulent misrepresentation by the plaintiffs in filling out the enrollment form was wrongful. Therefore, at this juncture the focus is only on fraudulent misrepresentation as grounds for rescission.

██ Generally, in Iowa, "fraudulent misrepresentations leading to the creation of a contract give[s] rise to a right of rescission." *Robinson v. Perpetual Servs. Corp.,* 412 N.W.2d 562, 568 (Iowa 1987); *see First Nat'l Bank in Lenox v. Brown,* 181 N.W.2d 178, 182 (Iowa 1970) ("It is a well settled principle of equity that misrepresentations amounting to fraud in the in-

ducement of a contract, whether innocent or not give rise to a right of avoidance on the part of the defrauded party."). Under Iowa law, five elements must be proven where a party seeks to rescind a contract based on a fraudulent misrepresentation: (1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance. *City of Ottumwa v. Poole,* 687 N.W.2d 266, 269 (Iowa 2004); *Rubes v. Mega Life And Health Ins. Co., Inc.,* 642 N.W.2d 263, 269 (Iowa 2002); *Hyler v. Garner,* 548 N.W.2d 864, 872 (Iowa 1996); *Swihart v. Universal Underwriters Life Ins. Co.,* 669 N.W.2d 260 (Table), 2003 WL 21361008 at *3 (Iowa Ct.App. Jun.13, 2003); *Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286, 292 (Iowa 1975); *see also Dishman v. American General Assurance Co.,* 193 F.Supp.2d 1119, 1123 (N.D.Iowa 2002); *Gunderson,* 85 F.Supp.2d at 920; *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.,* 2000 WL 33915816 at *5 (N.D.Iowa Nov.20, 2000); *Utica,* 892 F.Supp. at 1193. Importantly, proof of scienter, which is required to sustain an action at law for fraudulent misrepresentation, is notably absent. *See Hyler,* 548 N.W.2d at 871 (noting that rescission can be obtained absent proof of scienter and pecuniary damage); *Wilden Clinic, Inc.,* 229 N.W.2d at 292 (recognizing that in equity, relief from fraud can be granted absent a showing of scienter or pecuniary damage). As this court thoroughly discussed in *Utica Mutual Insurance Company v. Stockdale Agency,* 892 F.Supp. 1179 (N.D.Iowa 1995), lack of the element of scienter is a historical distinction between the proof required to sustain an action in equity to rescind the contract and that required to sustain an action at law for fraudulent misrepresentation. *See id.* at The Iowa Supreme Court recently discussed this important distinction:

An action to rescind a contract is regarded as less severe, and hence less demanding in its proof requirements, than an action at law for damages based on fraud. *Hyler*, 548 N.W.2d at 871. In an equitable rescission action, it is not the knowledge of falsity that is at issue but "whether misrepresentations induced the complaining party to contract." *Utica*, 892 F.Supp. at 1195. As this court stated in *Hyler*, injecting an "intent to deceive" element in a rescission case would reintroduce the concept of scienter, "making the elimination of this requirement in equity cases illusory."

*Hyler*, 548 N.W.2d at 872; *see Rubes*, 642 N.W.2d at 269. In order to uphold the historical distinction between at law and in equity relief for fraudulent misrepresentation, the concept of scienter must never enter the equation in determining whether a party is justified in pursuing the equitable relief of rescission—therefore, the intent necessary to sustain an equity action is merely the intent to induce the complaining party to contract. *Utica*, 892 F.Supp. at 1195; *Rubes*, 642 N.W.2d at 269; *Hyler*, 548 N.W.2d at 871. In an equity action for fraudulent misrepresentation, fraud may be inferred from the circumstances, words and actions in evidence. *Utica*, 892 F.Supp. at 1197; *accord Wilden Clinic*, 229 N.W.2d at 292 ("Fraud may arise from facts and circumstances, and an *intent* to defraud may properly be inferred from circumstances, words, and actions shown in evidence.").

In this case, Fortis identifies the Schmidts "no" responses to Questions 15 and 18(k) as fraudulent misrepresentations giving rise to Fortis's right to rescind the policy back to its effective date of September 1, 2001. The Schmidts concede that the only element of equitable rescission at issue is falsity, and that all of the remaining four elements are established.[19] Therefore, like the parties, the court will focus exclusively on the element of "falsity" in determining whether the record supports summary judgment for either party. However, before delving into the arguments of the parties and the legal analysis of the cross-motions for summary judgment, the court will first set forth the basic principles of contract construction and interpretation under Iowa law.

## 2. Construing and interpreting insurance contracts under Iowa law

Under Iowa law, an application for insurance becomes a part of the insurance contract by virtue of Iowa Code § 515.94 where the application "by the terms of such policy, is made a part of the policy, or of the contract of insurance, or [is] referred to in the contract of insurance, or which may in any manner affect the validity of such policy." IOWA CODE § 515.94; *see Utica*, 892 F.Supp. at 1201. The For-

---

**19.** In their Motion for Summary Judgment, the Schmidts, in a footnote, proffer a bare assertion that they do *not* concede that element five, justified reliance, is established. Fortis, in its cross-motion for summary judgment, points out that the Schmidts do not cite any authority for this position and assert that the element of justified reliance is, in fact, established. In their resistance to Fortis's motion for summary judgment, the Schmidts offer no further argument on this issue. There is insurmountable evidence that Fortis justifiably relied on the Schmidts' conceded representations on the enrollment form in determining whether coverage should have been extended—this is evidenced by the language of the enrollment form and the policy indicating that coverage was extended based on the answers the Schmidts gave on the enrollment form. *See* Plf.s' App. at 75; Def.'s App. at 176–77. Therefore, the court finds that Fortis's reliance on the Schmidts' representations was justified as a matter of law and the court will proceed in its analysis of only the 'falsity' element of equitable rescission.

tis enrollment form specifically states that "[t]he enrollment form and any amendments shall be the basis for the contract" and that "any fraudulent statement or material misrepresentation on the enrollment form and/or any amendment may result in claim denial or contract rescission." Plf.s' App. at 84. Further, the letter accompanying the policy states that the "contract has been issued based on the statements ... made in [the] Application for Insurance," and "[a]ny incorrect statement ... could void ... coverage or cause a claim to be denied." Plf.s' App. at 105. Therefore, the question of whether any terms in the enrollment form are ambiguous must be decided under the standards for determination of the ambiguity of terms in an insurance contract. Therefore, the court will briefly review the rules and principles governing interpretation of insurance contracts under Iowa law.

■ The policy must be construed as a whole, giving its terms their ordinary, not technical, meaning. *Id.; see Lee County v. IASD Health Serv. Corp.,* 2000 WL 290367 at *4 (Iowa Dist.2000); *AMCO Ins. Co. v. Rossman,* 518 N.W.2d 333, 334 (Iowa 1994); *Pappas v. Bever,* 219 N.W.2d 720, 721 (Iowa 1974). Words left undefined by the policy are not given their technical meaning, but rather the ordinary meaning which a reasonable person would accord them. *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 618 (Iowa 1991). In some cases, an objective inquiry into the meaning of the policy language reveals it is susceptible to two fair interpretations—it is in this instance that this language is deemed ambiguous. *See LeMars Mut. Ins. Co. v. Joffer,* 574 N.W.2d 303, 307 (Iowa 1998) (noting that the test of ambiguity is objection, requiring the court to ask: "Is the language fairly susceptible to two interpretations?"); *Thornton v. Hubill, Inc.,* 571 N.W.2d 30, 33 (Iowa Ct.App.1997) ("An ambiguity exists when, after application of the pertinent rules of interpretation to the contract language, a genuine uncertainty exists as to which of two reasonable constructions is proper."); *Nepstad Custom Homes Co. v. Krull,* 527 N.W.2d 402, 405 (Iowa Ct.App.1994); *A.Y. McDonald Indus., Inc.,* 475 N.W.2d at 618 ("Ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one."). A mere disagreement between the parties as to the meaning of a policy term does not equate to ambiguity. *Balzer Bros. v. United Fire & Cas. Co.,* 2000 WL 1027258 at *2 (Iowa Ct.App.2000); *Tom Riley Law Firm, P.C. v. Tang,* 521 N.W.2d 758, 759 (Iowa Ct.App.1994); *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 108 (Iowa 1981). The court must be diligent in according the policy language only its ordinary and natural interpretation, and must not "give a strained or unnatural reading to the words of a policy to create ambiguity where there is none." *Morgan v. American Family Mut. Ins. Co.,* 534 N.W.2d 92, 99 (Iowa 1995), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.,* 612 N.W.2d 775, 784 (Iowa 2000). It is fundamental that where a term is ambiguous, the interpretation most favorable to the insured must be adopted due to the adhesive nature of insurance policies. *Balzer Bros.,* 2000 WL 1027258 at *2; *Joffer,* 574 N.W.2d at 307; *Cincinnati Ins. Co. v. Hopkins Sporting Goods, Inc.,* 522 N.W.2d 837 (Iowa 1994); *Jensen v. Jefferson County Mut. Ins. Ass'n,* 510 N.W.2d 870, 871 (Iowa 1994); *A.Y. McDonald Indus., Inc.,* 475 N.W.2d at 619; *North Star Mut. Ins. Co. v. Holty,* 402 N.W.2d 452, 454 (Iowa 1987);

■ Construction of insurance contracts is *always* a matter of law for the

court. *See AMCO Ins. Co.*, 518 N.W.2d at 334; *Jensen,* 510 N.W.2d at 871; *Grinnell Mut. Reinsurance Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988). In most instances, "interpretation of an insurance policy is a question of law for the court to decide." *Morgan,* 534 N.W.2d at 99; *see also AMCO Ins. Co.,* 518 N.W.2d at 334; *Voeltz,* 431 N.W.2d at 785. However, interpretation becomes a question of fact where the interpretation depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen,* 510 N.W.2d at 871 (citation and quotation omitted); *Voeltz,* 431 N.W.2d at 785. Extrinsic evidence refers to evidence other than the words of the policy. *Utica,* 892 F.Supp. at 1202; *Jensen,* 510 N.W.2d at 871; *Voeltz,* 431 N.W.2d at 785; *Rodman v. State Farm Mut. Auto. Ins. Co.,* 208 N.W.2d 903, 906 (Iowa 1973) ("'Thus we have consistently construed policy terms strictly against the insurer and where several interpretations were permissible, we have chosen the one most favorable to the assured.'") (quoting *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 208 A.2d 638, 644 (1965)). The bottom line is that the court must "'ascertain from [the policy's words] the intent of the insurer and insured at the time the policy was sold.'" *Utica,* 892 F.Supp. at 1202 (quoting *Jensen,* 510 N.W.2d at 871, in turn quoting *Voeltz,* 431 N.W.2d at 785). This court has delineated, discussed, and applied these Iowa rules of interpretation of insurance contracts on many prior occasions. *See Wells Dairy, Inc. v. Travelers Indemnity Co. of Illinois,* 241 F.Supp.2d 945, 960–61 (N.D.Iowa 2003); *National Union Fire Ins. Co. of Pittsburgh, P.A. v. Terra Industries, Inc.,* 216 F.Supp.2d 899, 909–11 (N.D.Iowa 2002); *Terra Industries, Inc. v. Commonwealth Ins. Co. of Am.,* 981 F.Supp. 581, 588 (N.D.Iowa 1997); *Coulter v. CIGNA Property & Cas. Cos.,* 934 F.Supp. 1101, 1114–15 (N.D.Iowa 1996); *Utica,* 892 F.Supp. at 1201–02.

### 3. Question 18(k)

#### a. The question

Though Question 18(k), and the Schmidts' response thereto on the application, has been discussed above, it would be most prudent to reiterate the precise question and response prior to delving into the parties' arguments for summary judgment. Question 18(k) asked:

**WITHIN THE LAST 10 YEARS HAS ANY PROPOSED INSURED:**

**18. HAD ANY DIAGNOSIS OF, RECEIVED TREATMENT FOR, OR CONSULTED WITH A PHYSICIAN CONCERNING: ....**

k) Cancer? Provide location, type of cancer and treatment received.

Plf.s' App. at 81. In response to this question the Schmidts checked "no." Further, as additional medical information was requested only as to any "yes" responses, the Schmidts did not provide additional details regarding medical details in the space so designated in the enrollment form. As Question 18(k) asked only for information for the ten years preceding the application, the pertinent time window in this case is from August 9, 1991 through August 9, 2001. The parties concede that Karen was *not* diagnosed with cancer during the pertinent ten-year time window. However, there is serious contention as to whether Karen received "treatment for ... cancer" or "consulted with a physician concerning ... cancer," and whether these phrases are ambiguous. However, before delving into an analysis of the alleged ambiguity of these phrases, the court must first address a separate argument asserted by the Schmidts—that Kiel's knowledge of Karen's past medical history should be imputed to Fortis as Kiel was acting as

Fortis's agent at the time the application was submitted, thereby entitling the Schmidts to judgment as a matter of law. Because lack of a genuine issue of material fact that Kiel knew of the breadth of Karen's medical treatment and was an agent of Fortis could dispose of the inquiry into Question 18(k) altogether, the court will address that argument first before proceeding to an interpretation of the language at issue.

### b. Can Kiel's knowledge be imputed to Fortis?

Though the parties spend considerable time arguing this issue, the court, at this juncture, will distill the parties arguments down to their most basic roots. The Schmidts argue that Kiel knew of Karen's tamoxifen use and follow-up procedures (i.e. mammograms, chem panels, chest x-rays, bone scans) as Karen had discussed these things with him and as he had unrestricted access to the numerous medical records Karen provided him which detailed her background. Therefore, according to the Schmidts, because Kiel was acting in an agent capacity, his knowledge of Karen's medical history must be imputed to Fortis. Fortis points out that a material factual dispute as to what Kiel did or did not know of Karen's medical condition prevents the entry of summary judgment for the Schmidts on these grounds. Further, Fortis argues that regardless of what Kiel knew his knowledge cannot be imputed to Fortis because he and Karen acted together to perpetrate a fraud on Fortis, and that Kiel was not truly acting as Fortis's agent at the time he assisted the Schmidts in the application process. In support of this contention that Kiel and Karen acted to perpetrate a fraud on Fortis, Fortis points to the following: (1) Karen was aware of the negative impact that her breast cancer history could have on her chances of obtaining health insurance; (2)

Kiel advised Karen on how to obtain health insurance despite her breast cancer history; (3) Karen 'carefully screened' the medical records she submitted to Midwest Benefits; (4) Kiel and Karen selected Life Investors because it was more likely to issue health insurance to someone with a history of breast cancer; (5) when Life Investors failed to extend coverage, Karen was aware that she would unlikely be able to secure coverage if her health history was disclosed; (6) Kiel and Karen carefully selected Fortis only because they felt the different application language (asking only for health history within the past 10-years rather than 'ever') would enable them to submit an application without disclosing Karen's breast cancer history; and (7) on the advice of Kiel, Karen wrote Life Investors to attempt to exercise her rights under the Gramm–Leach–Bliley Act so that her medical records would not be disclosed to Fortis and thereby jeopardize her chances of obtaining coverage from Fortis. Fortis contends intent to perpetrate a fraud can be gleaned from these circumstances and, therefore, Kiel's knowledge of Karen's medical history cannot be imputed to Fortis.

### ■ i. Knowledge of tamoxifen use.

Section 515.125 of the Iowa Code defines who is an 'agent':

> Any officer, insurance producer, or representative of an insurance company doing business in this state who may solicit insurance, procure applications, issue policies, adjust losses, or transact the business generally of such companies, shall be held to be the agent of such insurance company with authority to transact all business within the scope of the agency relationship, anything in the application, policy, contract, bylaws, or articles of incorporation of such company to the contrary notwithstanding.

IOWA CODE § 515.125 (2004); *see* IOWA CODE § 515.123 (repealed effective January 1, 2002) (defining a 'soliciting agent'). As this court explained in great detail in *St. Paul Reinsurance v. Commercial Financial Corporation,* 144 F.Supp.2d 1057 (N.D.Iowa 2001) the knowledge of a soliciting agent is imputed to the insurance company. *Id.* at 1080–81; *see Imperial Cas. & Indem. Co. v. Carolina Cas. Ins. Co.,* 402 F.2d 41, 44 (8th Cir.1968) (operating under Iowa law, and holding that the knowledge of persons soliciting insurance or procuring an application for insurance was imputed to the insurance companies); *Voeltz,* 431 N.W.2d at 788 ("We have said that the knowledge and representations of the soliciting agent are imputed to and binding on the insurer."); *Johnson v. United Investors Life Ins. Co.,* 263 N.W.2d 770, 772 (Iowa 1978) ("Our cases have uniformly held that a soliciting agent's knowledge and material declarations at the time an application for insurance is obtained are binding on the company . . . ."); *Cornett v. Farmers' Mut. Fire Ins. Ass'n of Webster and Adjoining Counties, Ft. Dodge,* 208 Iowa 450, 224 N.W. 524, 526 (Iowa 1929) ("It is a settled rule in this state that an insurance company is chargeable with the knowledge on the part of its soliciting agent."). Even negligence by a soliciting agent in procuring information is a risk borne by the insurer, not the insured. *Id.* at 1081 (citing *Imperial Cas. & Indem. Co.,* 402 F.2d at 44–45 and *Johnson v. Farmers' Ins. Co.,* 184 Iowa 630, 168 N.W. 264, 267 (Iowa 1918)); *see Prudential Ins. Co. of Am. v. Launsdail,* 235 Iowa 125, 15 N.W.2d 880, 883 (Iowa 1944) ("It is well settled that when misstatements are [made only on the motion of] its agent, their falsity may not be set up by the insurance company to avoid the policy even though it would not have issued the policy had truthful statements been made."); *Hully v. Aluminum Co. of Am.,* 143 F.Supp. 508, 513 (S.D.Iowa 1956) ("The mistake or negligence of the agent within the scope of apparent authority is the responsibility of the insurance company."); *Conrad v. Farmers Mut. Hail Ins. Ass'n of Iowa,* 223 Iowa 828, 273 N.W. 913, 916 (Iowa 1937) ("the insurer will not be permitted to avoid the policy by taking advantage of a misstatement in the application material to the risk which is due to mistake or negligence of its agent, and not to fraud or bad faith on the part of the insured."). There does not seem to be any dispute that Kiel falls under the definition enumerated in Iowa Code § 515.125, and, is therefore an agent of Fortis, so the court will first turn to the record to establish what each individual (Karen, Kiel and Baumler) recalled regarding Karen's medical history.

■ According to her testimony, Karen discussed the following details about her medical history with Kiel and with Baumler:

Q: What do you recall discussing with Loren [Kiel] by way of your medical history?

A: I discussed with Loren that I had breast cancer in 1989, that I had a mastectomy in 1989. At that point I was cancerfree. That I received chemotherapy in an adjuvant state, in an adjuvant setting, and that I took Tamoxifen as a medication for preventative, prophylactic treatment.

Q: Anything else, in terms of your medical history, that you discussed with Loren?

A: No

Q: Do you recall what you discussed with Karla with regard to your medical history?

A: The same.

Deft.'s App. at 145; *see also* Karen M. Schmidt Affidavit, Plf.s' App. at 35–36 (providing an account consistent with Kar-

en's deposition testimony). Therefore, according to Karen, she told both Kiel and Baumler, in addition to her having breast cancer and a mastectomy, that she was cancer free following the mastectomy, that she received chemotherapy in an adjuvant setting, and that she took Tamoxifen for preventative and prophylactic reasons.

Unlike Karen's account, Kiel's recollection is not lucid regarding what she told him of her medical history. When asked what kind of information Karen provided him regarding her breast cancer history, he responded:

> I think specifically that she had had breast cancer and that, you know, the approximate dates going back about when that—when she was treated for that, that she—but she said she had had no problems. She was declared free of cancer and she was in good health.

Plf.s' App. at 6. When asked more specific questions regarding whether Karen had relayed her chemotherapy and tamoxifen use, Kiel responded as follows:

> Q: . . . did she tell you she had undergone chemotherapy treatment? . . . .
>
> A: I guess I don't exactly recall what. I knew she indicated treatment. That she probably had some follow-up treatment after the mastectomy.
>
> I can't—I don't know if there was— we talked in detail about the exact treatment, just the treatment periods and when she had, you know, gotten ill later and that sort of a thing.
>
> Q: Did she talk to you about taking medication after the surgery?
>
> A: **I don't think we talked about anything about medications, being that they were medications.**

Plf.s' App. at 6. When Kiel was specifically questioned about his knowledge of Karen's tamoxifen usage, Kiel responded as follows:

> Q: Did you know, as of August 2001 I'm just looking for your best recollection, that Karen had taken the drug Tamoxifen following her breast cancer surgery?
>
> A: I don't think so.

> \* \* \* \* \* \*

> Q: . . . . I just wanted to ask you, are you certain that you had not discussed Tamoxifen and the taking of that drug with Karen before submitting [any insurance applications]? . . . .
>
> A: **No. I don't recall having knowledge that she was taking a prescription drug relating to cancer treatment.**

Plf.s' App. at 12, 22. In fact, Kiel testified that he was not aware of Karen's tamoxifen usage until sometime in 2003. *See* Deft.'s App. at 128 (indicating that he did not become aware that Karen had taken tamoxifen in the ten years preceding August 2001 until he was contacted by a Fortis representative regarding rescission of the Fortis policy).

With regard to Karen undergoing other procedures, Kiel asserts that he knew that she had "a mammogram regularly." Deft.'s App. at 130. Kiel also generally stated that it was his understanding, "from what [he] had seen of the medical records and what [he and Karen] talked about, that she [had not been] treated for cancer in the last ten years." Plf.s' App. at 11. Kiel admits to reviewing the medical records that Karen provided to him to be submitted with the Life Investors application, but that the information did not mean much to him as he did not have medical training or background. *Id.* at 11–12. Kiel testified that he "highly doubts" that he looked through "her radiology reports and so forth." *Id.* at 12.

In sum, according to Kiel's testimony, Karen told him about the breast cancer

and mastectomy, did not tell him of her tamoxifen use, and may have told him of her chemotherapy treatment following the mastectomy. Further, while Kiel remembers looking through the medical records Karen provided, his lack of medical background rendered them meaningless to him, and he could recount with specificity only that Karen had regular mammograms.

In contrast to Kiel's testimony, Baumler testified that she was aware that Karen was taking tamoxifen before any health insurance applications were submitted and that she had discussed Karen's tamoxifen use with Kiel:

> Q: Did you talk to Karen about that, the drug, the Tamoxifen that she had been taking?
>
> A: Uh-huh. Uh-huh.
>
> Q: And you were aware of that?
>
> A: Uh-huh.
>
> Q: Did you talk to Loren about the Tamoxifen issue?
>
> A: Uh-huh.

Plf.s' App. at 29. Baumler reaffirmed her knowledge of Karen's tamoxifen usage later in her testimony:

> Q: Okay. And as you sit here today, do you have a specific recollection as to when you became aware that Karen Schmidt was taking a drug, I guess, as you said, for preventative measures?
>
> Do you have a recollection, as you sit here today, when you first became aware of that?
>
> A: When we first started dealing with all of this application stuff.
>
> Q: So you were aware of that?
>
> A: **From day one.**
>
> *     *     *     *     *     *
>
> Q: Do you recall whether or not you knew the name of the drug before ... August 13 of 2001?
>
> A: Yes.

> Q: And what was the name of the drug, at least that you recall?
>
> A: Tamoxifen.

*Id.* at 31–32 (emphasis added). Baumler also testified that she looked through the medical records provided by Karen, and that she took the following from those records:

> Basically, that she had the cancer, was— I think it was 12 years prior to that. That she was on this drug for the preventative measures. I mean, I didn't look at it thoroughly by any means. I'm no medical doctor, so ...

Plf.s' App. at 28.

So, according to Baumler's recollection, she knew of Karen's tamoxifen usage "[f]rom day one," and in contradiction to Kiel's memory, she and Kiel discussed Karen's tamoxifen usage. *Id.* at 31; *see id.* at 33 (noting that Baumler discussed Karen's tamoxifen usage with Kiel during the application process). Further, while she was aware of, and looked through, the medical records provided by Karen, she does not remember gleaning anything other than that Karen was on tamoxifen and that she had cancer over a decade prior to 2001.

From this review of the record, there can be no question but that—regardless of which party is afforded all reasonable inferences in their favor—a genuine issue of material fact exists as to what Kiel knew, or didn't know, regarding Karen's medical history, precluding summary judgment on this ground. However, before proceeding to a determination of whether Question 18(k) contains ambiguous language, the court will first briefly address Fortis's argument that Kiel and Karen colluded to perpetuate a fraud upon Fortis—as such argument, if successful, would prevent imputation of Kiel's knowledge, whatever that may be, upon Fortis.

*ii. Scheme to perpetuate a fraud on Fortis?* Although knowledge of an agent is generally imputed to the principal,

> [a]n exception to imputation of notice from the agent to the principal is well recognized where the conduct and dealings of the agent clearly raise a presumption that he would not communicate the fact in controversy, as where such communication would necessarily prevent the consummation of a fraudulent scheme the agent was engaged in perpetrating.

*Mechanicsville Trust & Sav. Bank v. Hawkeye–Security Ins. Co.,* 158 N.W.2d 89, 91 (Iowa 1968); *see Nissen v. Nissen Trampoline Co.,* 241 Iowa 474, 39 N.W.2d 92, 96 (Iowa 1949) (recognizing an exception to the imputation of an agent's knowledge to the principal "in cases where the knowledge of the agent is obtained while he is engaged in committing an independent fraudulent act on his own part, the communication of which to the principal would necessarily prevent its consummation"); *State v. McCutchan,* 219 Iowa 1029, 259 N.W. 23 (Iowa 1935) (holding that it would be "unjust and illogical to impute the knowledge of the agent" to the principal where "the agent was engaged in perpetrating fraud upon his principal"); *C.E. Erickson Co. v. Iowa Nat. Bank,* 211 Iowa 495, 230 N.W. 342, 344 (Iowa 1930) ("It is generally accepted, however, as a rule of law, that a principal is not chargeable with the fraudulent knowledge acquired by his agent in pursuit of a purpose by the agent to defraud his principal."); *Millenkamp v. Willenburg,* 184 Iowa 809, 169 N.W. 112, 113 (Iowa 1918) ("It is enough to say that the rule which constructively charges the principal with the knowledge of his agent does not operate in favor of the agent nor in favor of those who join the agent in perpetrating a wrong upon the principal."); *Findley v. Cowles,* 93 Iowa 389, 61 N.W. 998, 1000 (Iowa 1895) (noting an exception to the general rule that an agent's knowledge is imputed to the principal where the situation is such that communication of this knowledge would subvert the agent's fraudulent scheme).

> In other words, if, in the course of the same transaction in which he is employed, the agent commits an independent fraud for his own benefit, and designedly, against his principal, and it is essential to the very existence or possibility of such fraud that he should conceal the real facts from his principal, then the ordinary presumption or a communication from the agent to his principal fails.

*Home Indemnity Co. of New York v. State Bank of Fort Dodge,* 233 Iowa 103, 8 N.W.2d 757, 772 (Iowa 1943). This is so because, " 'as a general rule, the same person cannot act as agent for both the company and the insured....' " *Cole v. Hartford Acc. & Indem. Co.,* 242 Iowa 416, 46 N.W.2d 811, 817–18 (Iowa 1951) (quoting *Nertney v. National Fire Ins. Co.,* 199 Iowa 1358, 203 N.W. 826, 830 (Iowa 1925)); *see Smith v. Iowa State Live Stock Ins. Co.,* 195 Iowa 250, 191 N.W. 981, 984 (Iowa 1923) (holding insurance company not legally chargeable with knowledge of agent who participated in perpetuating a fraud with the insureds). In determining whether this adverse interest exception applies, Iowa looks to whose interests the agent was aligned—the principal he purported to serve (i.e. Fortis), or someone else (Kiel or the Schmidts). *See Waitt v. Speed Control, Inc.,* 2002 WL 1711817 at *22–23 (N.D.Iowa Jun.28, 2002) (finding genuine issue of material fact as to whether adverse interest exception applied as to whether an individual defendant was aligned with other corporate defendants at the time he purported to serve the plaintiff

in investing in the corporate defendant). Iowa courts have found such an adverse interest to exist mostly where the agent had perpetrated a fraud upon the principal for his own personal gain. *See, e.g., State v. Mullin,* 225 N.W.2d 305, 307–08 (Iowa 1975) (finding exception did not apply where employee of the bank, with knowledge that a customer's account was overdrawn, accepted and paid that customers check when presented); *First Federal Bank v. Delaney,* 690 N.W.2d 697, 2004 WL 1854154 at *1–2 (Iowa Ct.App. July 14, 2004) (finding adverse interest exception applicable to knowledge of an agent, who was a vice president and loan officer for the bank, that entered false information on defendant's loan applications and received payments from defendant totaling more than fifty thousand dollars). Finally, it is elementary that in order to prove that Kiel and Karen colluded to perpetrate a fraud upon Fortis, Fortis must show by clear and convincing evidence the following elements: "(1) materiality, (2) falsity, (3) representation, (4) scienter, (5) intent to deceive, (6) justifiable reliance and (7) resulting injury" or damage. *Clark v. McDaniel,* 546 N.W.2d 590, 592 (Iowa 1996); *see Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 400 (Iowa 2001) (citing elements of fraudulent misrepresentation and adding the "amount of damages" as an eighth element); *Midwest Home Distrib., Inc. v. Domco Industries Ltd.,* 585 N.W.2d 735, 738 (Iowa 1998) (citing elements); *Magnusson Agency v. Public Entity Nat'l Company–Midwest,* 560 N.W.2d 20, 28 (Iowa 1997) (listing elements). Of key import in this discussion are the elements of scienter (knowledge of falsity) and intent to deceive—as no genuine issue of material fact as to these two key elements has been generated by the record.

Fortis basically argues that Kiel was an active participant in the Schmidts' plan to defraud Fortis into extending Karen health insurance coverage to which she was not entitled, and for Kiel himself to receive a commission from Fortis for procuring that policy—essentially asserting that Kiel was acting both as an agent for Fortis and the Schmidts, thereby prohibiting the imputation of Kiel's knowledge to Fortis. The court now turns to an examination of the record to determine whether a genuine issue of material fact exists as to whether Karen, in conjunction with Kiel, participated in a plan to defraud Fortis. *See Utica,* 892 F.Supp. at 1196–97 (looking to the surrounding facts and circumstances to determine whether an intent to defraud existed); *Wilden Clinic, Inc.,* 229 N.W.2d at 292 ("Fraud may arise from facts and circumstances, and an *intent* to defraud may properly be inferred from circumstances, words, and actions shown in evidence.") (internal citations omitted). In performing this task, the court finds that a general timeline of events of assistance:

- Karen prepared a letter dated July 24, 2001, to Life Investors purporting to exercise the Schmidts' rights under the Gramm–Leach–Bliley Act to keep her medical records confidential and prevent them from being forwarded to any Medical Information Bureau.

- July 26, 2001—the Schmidts filled out the Life Investors application and sent it back to Midwest Benefits with a packet of Karen's medical records and the July 17, 2001, letter from Dr. Hansen.

- Between July 26, 2001 and August 8, 2001, Life Investors contacted Baumler and/or Kiel to inform them that there was a problem with the Life Investors application. Also during this time period, Kiel called Karen to inform her of the problem. Baumler's correspondence notebook contains a notation to call Life Investors on August 6, 2001, which may or may not have been related to Life

Investors call informing them of the problem with the application.

● By August 8, 2001, Kiel, Baumler and the Schmidts were engaged in completing the Fortis Application.

● On August 9, 2001, the Schmidts completed the Fortis application and mailed it to Midwest Benefits.

● A letter dated August 10, 2001, from Life Investors to Kiel, which inquires into whether Life Investors should proceed in underwriting the application as Karen would be denied. The letter also indicates it is a "second request."

● August 13, 2001—Fortis application mailed by Midwest Benefits.

● Letter dated August 20, 2001, from Fortis to the Schmidts indicates that Fortis has accepted the application and will extend coverage effective September 1, 2001.

● August 28, 2001—Baumler faxes Life Investors instructing them to discontinue underwriting the Schmidts' application.

● Letter dated August 30, 2001, from Life Investors to Daniel acknowledges the request to withdraw his application and states that Life Investors's evaluation of the Schmidts' application has ceased pursuant to that request.

The court finds that Life Investors's perceived likelihood to offer coverage to someone with cancer history was only one reason that it was pursued—both Karen and Kiel testified that other reasons, such as coverage, premium price, quality of the company and better repertoire with the company motivated the decision. Plf.s' App. at 6; Deft.'s App. at 145–46. Also clear from the testimony is the fact that Karen voluntarily produced numerous medical records to Kiel and Baumler— which contained information of her diagnosis of cancer, her subsequent chemotherapy, her follow-up procedures, and her ta-

moxifen use. Aside from Fortis's bare allegation that Karen carefully screened the medical records she procured, there is *nothing* in the record to indicate that Karen 'filtered' the records that she produced to Kiel and Baumler—in fact, many of the records produced memorialized doctors' visits, procedures, and tests performed within the pertinent ten year period, as well as notations as to Karen's prescription drug intake. This forthright disclosure surely does not tend to illustrate the intent to defraud required under the law. *See Clark*, 546 N.W.2d at 592.

Also, this court finds that a genuine issue of material fact is not created by Karen's attempts to invoke privacy rights conferred upon her by Congress through the Gramm–Leach–Bliley Act—*especially* in light of the fact that Kiel gave Karen information about the Gramm–Leach–Bliley Act, and Karen took steps to invoke her rights, *in advance of their knowledge* that there was a problem with the Life Investors application. *See* Deft.'s App. at 154. It is perfectly reasonable that someone who divulged the extensive medical records that were attached to the Life Investors application would want to prevent that information from being distributed publicly—in fact, Karen testified that one of the reasons she authored the letter was to keep her information private from others, including other insurance companies. However, this is exactly the right that the Gramm–Leach–Bliley Act intends to preserve. Even construed in the light most favorable to Fortis, there is nothing about Karen's attempts to protect her privacy, or Kiel's actions in providing Karen with information regarding the Gramm–Leach–Bliley Act, that generates a genuine issue of material fact that Kiel and Karen intended to defraud Fortis.

Fortis points to the fact that it was *specifically targeted* by Kiel and the

Schmidts in their attempts to fraudulently procure health insurance for Karen based on the application language only inquiring back ten years into an applicant's medical history—and that Kiel and Karen saw this 'loophole' as a means of getting around sending the packet of medical records and Dr. Hansen's July 17, 2001, letter along with the Fortis application, as they knew its submission would likely defeat the application, just as it had defeated the Life Investors application. However, the record, even in the light most favorable to Fortis, does not support the sinister undertones that Fortis claims existed. First, Midwest Benefits, in 2001, only offered *three* individual policy options: Life Investors; Fortis; and Wellmark/Blue Cross & Blue Shield. Plf.s' App. at 27. Having been insured by BCBS in the past, Karen did not want to pursue a BCBS application. *See* Plf.s' App. at 5, 17; Deft.'s App. at 142. Life Investors was no longer a viable option, so that left Fortis as the *only remaining option* at Midwest Benefits for the Schmidts. Second, because the health questions on the Fortis application did not ask if an applicant had "ever" had a certain condition, but only asked for medical history going back ten years, Karen believed it was a "good opportunity" for the Schmidts to submit an application. *See* Plf.s' App. at 26. Kiel, Baumler and Karen came to the consensus that the Schmidts could correctly answer Question 18(k) "no" and that the medical records need not be submitted after numerous conversations about the matter. Plf.s' App. at 157. Karen testified as to the specifics of those conversations as follows:

> That I wanted to be sure that we answered the question correctly, that I had given careful consideration to it, and that I wanted [Kiel and Baumler] to

assure me that they had also. And did I answer the question correctly? Am I answering it correctly? And their response was yes.

Deft.'s App. at 158. Baumler testified that based on her conversations with Karen, "it was very clear that she answered the question to the best of her knowledge and correctly." Plf.s' App. at 29. In fact, the record in regard to the testimony of Kiel, Baumler and Karen indicates that Karen was concerned about answering Question 18(k) correctly, especially in light of her breast cancer history.[20] Even in the light most favorable to Fortis, a scheme to defraud Fortis *cannot* be derived from the fact that Kiel, Baumler and the Schmidts found the language requesting health history for only the past ten years advantageous and a better opportunity for the Schmidts to secure health insurance coverage—*especially* in light of the fact that Fortis was *ultimately in control* of the language used on the application. Fortis had *every right and opportunity* to pose *any* question regarding the health history of a proposed insured, and it chose to only ask for health history over the previous ten years. The fact that the Schmidts, Kiel and Baumler felt that this created a better opportunity than an insurance company asking if a proposed insured "ever" had a certain condition, especially in light of the fact that Fortis was the only remaining company to which the Schmidts could apply via Midwest Benefits, does not create a genuine issue of material fact that Kiel and Karen intended to defraud Fortis through the responses to any of the enrollment form questions.

Finally, Fortis contends that fraud should be inferred from the fact that Kiel

---

**20.** Despite Fortis's contentions to the contrary, the interpretation accorded Question 18(k) by Kiel, Baumler and Karen was not unreasonable as the language of the question was ambiguous—this is explored in great detail below.

kept the Life Investors application 'on hold' pending the submission of the Fortis application, and responded to Life Investors's August 10, 2001, letter inquiring into whether it should continue to process the Schmidts' application, until after Fortis had offered to extend coverage to the Schmidts. Fortis claims that Kiel further manipulated the system by requesting the Life Investors application be 'withdrawn' so that it could be argued that it was never formally denied, and that Question 15 could then 'technically' be answered in the negative. The only possible fact in the record supporting this assertion is the fact that Life Investors sent a letter to Kiel, dated August 10, 2001, indicating that Karen would be denied due to her breast cancer history, and inquiring as to whether Life Investors should continue processing the application, and the request to withdraw the application was not made until Baumler faxed such a request to Life Investors on August 28, 2001. Plf.s' App. at 117–18. The August 10, 2001, letter indicates that it is a "second request," however, while it was common for Life Investors to contact Midwest Benefits via phone, e-mail or fax, initially to indicate that there was a problem with a particular application—neither Kiel nor Baumler have specific recollection as to whether this in fact occurred, or if it did, what was communicated to them regarding the status of the application. This murky area of the record regarding what the "first" communication from Life Investors entailed, without more, is not enough to generate a genuine issue of material fact that Karen and Kiel engaged in a scheme to defraud Fortis—especially in light of the fact that Kiel received *nothing* from the Schmidts for his assistance in managing their applications, and in fact only received a commission from Fortis following Fortis's acceptance of the Schmidts' application.

In sum, the court finds that the facts, circumstances and actions surrounding the application process, even when viewed in the light most favorable to Fortis, do not generate a genuine issue of material fact that Kiel and Karen intended to deceive, or perpetrate a fraud upon, Fortis in answering Question 18(k), or Question 15, on the Fortis enrollment form. Nothing in the record illustrates conduct that raises a clear presumption that Kiel and Karen were engaged in a scheme to defraud Fortis. *See Mechanicsville Trust Sav. Bank,* 158 N.W.2d at 91. Therefore, there is no genuine issue of material fact that Kiel and the Schmidts conspired to defraud Fortis, and whatever Kiel's knowledge as to Karen's medical history may be, it can be imputed to Fortis. The court will now move on to an analysis of the language of Question 18(k) to determine if it is ambiguous, and furthermore, whether the Schmidts' "no" response was false.

### c. *"Treatment for"*

**i. Arguments of the parties.** In their motion for summary judgment, the Schmidts next contend that Karen did not receive treatment between August 9, 1991 and August 9, 2001. The Schmidts assert that it is undisputed that Karen did not undergo a mastectomy, chemotherapy, or radiation during the applicable ten-year time frame. Moving on to the first contentious issue, the Schmidts turn to whether Karen's tamoxifen use until 1996 constituted treatment. First, the Schmidts point to Fortis's current underwriting guidelines—which provide that "Hormonal therapy (tamoxifen, Arimidex, Femara) should not be included when determining 'time since treatment completed'." Plf.s' App. at 223. Further, Fortis's current underwriting guidelines state that cancer treatment includes only "surgery, radiation, and/or chemotherapy." *Id.* The Schmidts note that Fortis's current underwriting guidelines

mirror the position stated by Dr. Silberstein in his March 24, 2003, letter, *see* Plf.s' App. at 230 ("Tamoxifen, at that point in time, was a preventative prophylactic measure to prevent cancer from recurring"); and Dr. Hansen in his April 2, 2003, letter. *See* Plf.s' App. at 231 ("The Tamoxifen she was on for seven years was purely as a prophylaxis."). As no doctor treated Karen using radiation, chemotherapy or surgery from August 9, 1991 through August 9, 2001, Karen therefore did not receive "treatment for" cancer and the Schmidts' "no" response to Question 18(k) was therefore not false. In closing, the Schmidts assert that the "no" answer was truthful, and that the undisputed facts reveal that "Karen Schmidt, Loren Kiel and Karla Baumler all studied [Question 18(k)] in light of Karen Schmidt's cancer history and believed that the answer was truthful." Plf.s' Brief in Support of Motion for Summary Judgment, Doc. No. 18, at 26.

Fortis first argues that Karen's use of the prescription drug tamoxifen during the pertinent ten year period constituted "treatment for" cancer, thereby making the Schmidts' "no" response to Question 18(k) false as a matter of law. Fortis dismisses the Schmidts' arguments for summary judgment as relying on "semantic artifice," while Fortis claims its argument is based on "a number of authoritative sources." Combined Brief in Resistance to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment, Doc. Nos. 32 & 38, at 9 ("Deft.'s Combined Brief"). One such "authoritative source" is the opinion of board certified oncologist Dr. Roscoe Morton. Fortis's argument reiterates many of the points Dr. Morton made in a letter he composed after reviewing Karen's breast cancer history. Dr. Morton opined that in 1989, the prevailing treatment for stage II breast cancer, to increase the ten-year-disease free rate, following mastectomy, included adjuvant therapy including cytotoxic chemotherapy, radiation, and hormonal therapy such as tamoxifen use. Deft.'s App. at 85–86. Dr. Morton opined that the ten-year disease-free survival rate for those patients not partaking in any of these post-mastectomy adjuvant therapies was 41–42%. Deft.'s App. at 85–86. Dr. Morton opined that by receiving chemotherapy followed by hormonal therapy in the form of taking tamoxifen, a patient could improve her ten-year disease free survival rate from 41–42% to 63%. Deft.'s App. at 87. Based on a review of Karen's medical records, Dr. Morton came to the following conclusions regarding Karen's tamoxifen use:

> Based on review of the supplied medical records and the state of the art of adjuvant therapy in 1989, it is my opinion that the tamoxifen was used in this case as a treatment due to its salubrious effect on reducing the chance of recurrence of breast cancer and death rather than for prevention of breast cancer. Tamoxifen was combined with the CAF chemotherapy regimen and was given after the chemotherapy was completed. Thus, tamoxifen was an active part of the treatment of her breast cancer. The prevention capabilities of tamoxifen were incidental to its treatment component in this case.

Deft.'s App. at 86. Fortis also points to the fact that use of tamoxifen to reduce the risk of breast cancer in women who had *never* had breast cancer, a "purely prophylactic" measure, was not an approved use for tamoxifen until 1996. Deft.'s Combined Brief at 10–11.

Fortis also points to the fact that Karen, at various points between 1989 and 1996, considered ceasing her use of tamoxifen

but was counseled otherwise by Dr. Silberstein and Dr. Hansen as establishing that Karen understood that she was deriving a health benefit from staying on tamoxifen. Fortis also points to the fact that tamoxifen usage is not without risk, and that an April 9, 1994, release by the Food and Drug Administration (FDA) warned women and doctors that tamoxifen posed an increased risk of uterine cancer, but recognized that as tamoxifen could delay or prevent recurrence in patients that have undergone surgery for breast cancer that it "continue[d] to be indicated for the treatment of breast cancer." Deft.'s App. at 117. The April 9, 1994, warning also stated that outside of a clinical trial, tamoxifen should not be used prophylactically: "[T]amoxifen should not be used as a preventative agent outside of a clinical trial." *Id.* at 118. Fortis points out that in spite of the risks, Karen continued to use tamoxifen. Fortis concludes its arguments that tamoxifen use constituted "treatment for" cancer by asserting that Karen continued to take tamoxifen in spite of all the risks associated with taking the drug and that Karen's regimen of tamoxifen from 1989 through 1996 was an "integral part of her treatment for breast cancer"—thus making her response to Question 18(k) false and Fortis's rescission justified.

In their resistance, the Schmidts first turn to the opposing opinions of Dr. Silberstein and Dr. Morton. The Schmidts point out that Dr. Silberstein sees a distinction between active treatment and adjuvant therapy: "Adjuvant treatment is where the patient may or may not have cancer and then you're trying to reduce the risk of cancer.... [A]djuvant therapy is reducing the risk of cancer. And I emphasize to [my patients] that some of them may not have any cancer so that we are giving this measure to reduce the risk of recurrence when they may or may not have any cancer. So we're not treating a cancer if

there's no cancer there." Plf.s' Supp.App. at 271. And, under Dr. Silberstein's distinction, one cannot be actively treating something that is not *actually* present. Because Karen has had *no detectable residual cancer* since her mastectomy since March 1989, Dr. Silberstein contends that her tamoxifen usage *cannot* be treatment as there was nothing to treat—it was merely used as a preventative measure. The Schmidts dismiss Dr. Morton's opinions as based on statistical modeling, as employing incorrect calculations of tumor size (i.e. adding together the biopsy sample and mastectomy sample), and as irrelevant because his population models admittedly cannot predict for a specific individual's outcome. *See* Plf.s' Supp.App. at 260. The Schmidts then argue that construing the policy giving the word "treatment" its ordinary meaning there is no other conclusion but that the use of the term "treatment" in the enrollment form is ambiguous as pertains to Karen's tamoxifen use—particularly in light of the fact that there is disagreement between two oncologists (Dr. Silberstein and Dr. Morton) having specialized knowledge of the subject matter as to the meaning of the term in this context. The Schmidts then argue that, according treatment the ordinary meaning most favorable to themselves, as the insureds, Fortis must show that there *was something to treat* in order for it to be considered treatment and that even shifting all reasonable inferences in Fortis's favor, as Karen never had cancer between 1991 and 1996, her tamoxifen use *cannot,* as a matter of law, be considered "treatment for ... cancer." Further, the Schmidts dismiss Fortis's reference, in its motion for summary judgment, to a policy document defining treatment as "the medical or surgical management of a patient.... includ[ing] any ... Prescription Drug," Deft.'s App. at 177, as irrelevant because it

was not available to the Schmidts at the time they filled out the enrollment form on August 9, 2001. Finally, the Schmidts contend that the United States District Court for the District of Montana, in *Elliot v. Fortis Benefits Insurance Company,* Cause No. 01–11–BLG–GFC, already held that tamoxifen use does not constitute treatment. *See* November 7, 2001, Order and December 20, 2001, Order, Plf.s' Supp. App. at 296–313.

In its reply brief, Fortis focuses primarily on what it claims to be a definition for "treatment" in the policy as establishing both unambiguity and ultimately justifying Fortis's rescission of the contract. Following acceptance of the Schmidts' application, Fortis delivered the policy along with a copy of the completed application to the Schmidts, as required by Iowa law. *See* IOWA CODE § 515.94 (compelling insurance companies to attach a copy of the completed application to the policy). A letter accompanying the policy and certificate indicated that the policy was issued based on the representations on the enrollment form, and that the policy and the enrollment form should be reviewed by the Schmidts to ensure that the answers were accurate and complete. Plf.s' App. at 105. As quoted above, the certificate does contain language indicating that treatment includes prescription drugs—which Fortis contends is a "definition" of the term treatment. *See* Deft.'s App. at 177. Fortis contends that it is irrelevant that the Schmidts did not have this definition of treatment while they filled out their enrollment form, as they were requested to review the enrollment form in light of all policy documents to determine if there were any misstatements or inaccuracies. Fortis contends that, as a matter of law, the term "treatment" is unambiguous as it was defined in the policy to include prescription drugs, and the Schmidts have failed to produce *any* evidence that a defi-

nition of treatment to include prescription drugs is unreasonable or oppressive. Further, Fortis discounts the Schmidts' reliance on its 2004 underwriting guidelines, which exclude tamoxifen use from the determination of when cancer treatment ends, as they were *not* in effect at the time the Schmidts applied for coverage in 2001. Finally, Fortis reiterates that during the time Karen was taking tamoxifen, the *only* approved use of the drug was for treatment and that purely prophylactic use of tamoxifen was not approved until 1996. Finally, Fortis discounts the *Elliot* case as not having any precedential value on this court, and as clearly factually distinguishable from this case—as the issue was whether tamoxifen use constituted treatment in terms of defining a "pre-existing condition," and where "pre-existing" was defined by the disability policy in question. In closing, Fortis asks that the court find "treatment" unambiguous, accord it the "definition" set forth in the policy, and grant Fortis's motion for summary judgment.

***ii. Analysis.*** Before embarking on a discussion of the nuances of the parties' arguments, it is important to put the policy language discussing "treatment" into context. Therefore, the court will briefly set forth some of the pertinent language in the context it actually exists in the policy—as it bears directly on the court's obligation to determine if the term "treatment" as used in Question 18(k) is ambiguous. A letter dated August 20, 2001, from Fortis to the Schmidts indicated that Fortis had accepted the Schmidts' application and was extending them health insurance coverage. In part, this letter stated as follows:

> Your contract has been issued based on the statements you made in your Application for Insurance, a copy of which is attached to your contract. **It is important that you again take a few min-**

utes to review this form carefully to make sure it is accurate and complete. **Any incorrect statement ... could void your coverage or cause a claim to be denied. If you find an error or missing information on your Application, please advise us in writing immediately.**

Plf.s' App. at 105 (emphasis in original). In addition to a copy of the Schmidts' filled-out enrollment form, the policy certificate was attached to the letter. The certificate contained a sheet entitled "Definitions" which contains the language at issue regarding treatment—the following replicates the context in which that language is discussed:

> The capitalized terms used in this certificate are defined below....

| Covered Charges | An allowable charge for treatment that we determine is:<br>• provided by a Health Care Practitioner, facility or supplier,<br>• Medically Necessary,<br>• incurred by an Insured for an Illness or Injury,<br>• listed in the Covered Medical Services or Covered Prescription Drug Services sections, and<br>• not listed in the Exclusions section.<br>We will determine how much of a Covered Charge is allowable using the following:<br>• the actual charge;<br>• relative value scales which include difficulty, work risk and materials used;<br>• regional geographic factors for your area or a comparable area; and<br>• the rate we negotiate with the provider of service.<br>*Treatment is the medical or surgical management of a patient. Treatment includes any prescribed service, supply, test, consultation, advice or Prescription Drug.* |
|---|---|

21. In their arguments, the parties point to a variety of sources that they claim should be used in defining "treatment," for instance: (1) Fortis underwriting guidelines; (2) the opinions of Dr. Morton and/or Dr. Hansen; (3) the April 9, 1994, FDA release cautioning against use of tamoxifen for prophylactic treatment; and (4) the orders filed in the

Deft.'s Supp.App. at 177 (emphasis added). Looking at the language from this perspective it becomes obvious that the term "treatment" was defined only in reference to "Covered Charges." Further, the header explicitly limits the definitions to *"terms used in [the] certificate,"* and not the terms as used in any other portion of the insurance policy, including the enrollment form. *Id.* Therefore, while it is true that the application for insurance becomes a part of the policy under Iowa law, *see* IOWA CODE § 515.94, in this instance the document clearly reflects that it is defining only the terms in the certificate, and further that the term "treatment" is only defined *in reference to* "Covered Charges." Therefore, the court finds that this definition of "treatment" is limited to the express limitations placed on it by the document—that it is only applicable in determining "Covered Charges" as that term is used in the insurance certificate. Fortis authored all of these documents, so if Fortis wanted to include a definition solely for treatment, it could have done so. At *no place* in either the enrollment form or the policy is the term "treatment" defined independently of any other term. Therefore, the court finds that "treatment," as used in Question 18(k) is undefined.

As "treatment" is undefined by the policy, the court must now determine whether the term is objectively "susceptible to two or more meanings." *Met–Coil Sys. Corp. v. Columbia Cas. Co.,* 524 N.W.2d 650, 658 (Iowa 1994). In answering this question the court must look only to the language present on the enrollment form,[21] which in

*Elliot* case out of the District of Montana. However, *none* of these sources can be addressed in determining *if* a term is ambiguous—that determination comes from a review of the contract language *alone.* To consider any of these sources in answering the threshold question of ambiguity would be an impermissible reliance on extrinsic evidence. *See*

pertinent part asks: "WITHIN THE LAST 10 YEARS HAS ANY PROPOSED INSURED ... RECEIVED TREATMENT FOR.... Cancer?" Plf.s' App. at 81. Question 18(k) indicates that the "treatment" inquired of must be "for cancer"—therefore, "cancer" is the purpose of the "treatment." However, even in light of this indicator, examining the language as a whole, and giving the words their ordinary meanings, *Morgan*, 534 N.W.2d at 99, the court concludes that the term "treatment" as used in this context is ambiguous. First, the term "treatment," as used in this context, is reasonably susceptible to at *least* two meanings: the process of treating, and the specific techniques used to treat. In other words, "treatment" could mean either "the act or manner ... of treating ... something" or "the techniques ... customarily applied in a specified situation." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1258 (10th ed.1995); *see also* THE AMERICAN HERITAGE COLLEGE DICTIONARY 1440 (3d ed.1997) (breaking down treatment into two similar definitions). Looking only at these two ordinary definitions of "treatment," the term is clearly ambiguous when looked at in conjunction with the indicator "for cancer"— the first speaks to treating "something," while the second speaks to treatment applied "in a specified situation." The context of the use of "treatment" in Question 18(k) reveals nothing about which one of these common, ordinary meanings of the word apply. This ambiguity would allow an interpretation of "treatment," in the context of Question 18(k), to include the entire spectrum of means by which cancer can be managed—ranging from such drastic measures as surgical intervention to alternative therapies such as acupuncture, aromatherapy or meditation. Further, without further guidance, the term "treatment" could refer to any combination of active treatment, preventative/prophylactic treatment, or treatment received in an adjuvant setting. In fact, if accorded the broad definition Fortis proffers, the term could feasibly include *any* measure a proposed insured took which any source believed to lower the risk of cancer—even extending to a doctor's recommendation that a person with cancer history eat a diet that includes extra fruit and vegetables in combination with specific vitamin supplements. *See* National Cancer Institute: Cancer Facts–Gerson Therapy at *http:// cis.nci.nih.gov/fact/9_7.htm* (discussing Gerson therapy, which is described as "a dietary approach that has been used to treat cancer and other diseases, [that] focuses on the role of minerals, enzymes, hormones, and other dietary factors in restoring health and well-being." The Gerson Therapy regimen consists of 13 glasses of juice prepared from organic fruits and vegetables in addition to various vitamin supplements. "Salt, spices and aluminum cookware or utensils are not used when preparing food."). Clearly, use of the term "treatment" in Question 18(k) is the epitome of ambiguity.

This ambiguity in Question 18(k) as to the meaning of "treatment" must be construed against Fortis. *Utica*, 892 F.Supp. at 1203 (citing *Cincinnati Ins.*, 522 N.W.2d at 839). Consequently, the court must employ the definition of "treatment" most favorable to the Schmidts, which is "the act or manner ... of treating ... something" as that is arguably more restrictive than "the techniques ... customarily applied in a specified situation."[22] MERRIAM

*Utica*, 892 F.Supp. at 1202 (looking only to the application question, and no other documentation or evidence, to determine whether the terms used in the application were ambiguous).

**22.** This is so because "specified situation" could include any technique or action given:

WEBSTER'S COLLEGIATE DICTIONARY at 1258. However,

> [a]lthough interpreting the meaning of an (sic) insurance policy words is most often an issue of law for the court to decide, the interpretation becomes a question of fact where the interpretation depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen,* 510 N.W.2d at 871; *Grinnell Mut. Reinsurance Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988). Extrinsic evidence refers to evidence other than the words of the policy. *Id.; Voeltz,* 431 N.W.2d at 785.

*Utica,* 892 F.Supp. at 1202. In this case, even according "treatment" the common interpretation most favorable to the insured, inferences from evidence outside of the words of the policy—for example: (1) the deposition testimony of Dr. Morton and Dr. Hansen concerning whether Karen's tamoxifen use constituted treatment, and discussing the statistical modeling results as to whether her tamoxifen use was treating "something" or improved her likelihood of survival; (2) Karen's deposition testimony; (3) Kiel and Baumler's deposition testimony; (4) the April 9, 1994, FDA release cautioning against use of tamoxifen for prophylactic treatment; (5) the Fortis underwriting guidelines; and (6) orders filed in the *Elliot* case out of the District of Montana—are necessary in order to determine if Karen's tamoxifen use falls under this definition of "treatment." This is precisely because, looking purely at the words of the policy, it remains unclear as to what "something" would be in the context of the act or manner ... of treating ... something." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 1258. The plaintiffs urge that the "something" would be active can-

(1) to those with a history of breast cancer; (2) to those with active cancer; or (3) as a

cer, and as it is undisputed that the last time that Karen had detectable residual cancer was March 29, 1989, Plaintiffs' Supplemental Statement of Additional Material Facts in Support of Plaintiffs' Motion for Summary Judgment and in Resistance to Defendant's Motion for Summary Judgment, Doc. No. 50, at ¶ 120; *see* Defendant Fortis Insurance Company's Local Rule 56.1(d) Reply to Plaintiffs' Supplemental Statement of Additional Material Facts, Doc. No. 63, at 2 (admitting ¶ 120), her tamoxifen use during the relevant ten-year period would not constitute "treatment" as there was nothing to treat. On the other hand, Fortis would assert that "something" could include the recurrence of cancer, or undetectable residual cancer which was treated by Karen's tamoxifen use. These questions of fact cannot be resolved without turning to the extrinsic evidence noted above, therefore a genuine issue of material fact exists as to whether Karen's tamoxifen use constituted "treatment" as used in Question 18(k). As such, both the Schmidts' and Fortis's Motion for Summary Judgment are denied with respect to whether the Schmidts' "no" response was false as to the portion of Question 18(k) inquiring into whether any proposed insured had received "treatment for ... cancer" in the previous ten years.

### d. "Consulted with a physician concerning"

**■ i. Arguments of the parties.** The Schmidts vigorously argue that Karen did not "consult[ ] with a physician concerning ... cancer" between August 9, 1991 and August 9, 2001. *See* Plf.s' App. at 81. In support of their argument that there is no genuine issue of material fact as to whether Karen consulted a physician

purely preventative/prophylactic measure.

concerning cancer, the Schmidts rely on Dr. Hansen's Affidavit in which he avers that he "did not consult with Karen regarding her breast cancer or her cancer treatment after 1989." Plf.s' App. at 42. The Schmidts also spend a considerable amount of time distinguishing their situation from that before the Iowa Supreme Court in *Rubes v. Mega Life & Health Insurance Company, Inc.*, 642 N.W.2d 263 (2002). Generally, the Schmidts assert that there are key factual distinctions between this case and that presented by *Rubes*.[23]

In regard to whether Karen consulted with a physician concerning cancer, Fortis argues that Karen's medical records detailing a host of follow-up procedures—specifically, mammograms, bone scans, blood testing and chest x-rays—during the relevant ten year period constituted consultations with a physician concerning cancer. Fortis asserts that it is of particular import that Karen's regimen of follow-up procedures mirrors the treatment protocols for post-surgery breast cancer patients in 1989. Fortis also contends that despite Karen's assertions to the contrary, her almost annual mammograms were not routine, in that the standard for thirty-five to forty year-old women required only a single baseline mammogram, whereas Karen did not turn forty years-old until 1994—

therefore, the mammograms received in 1991 through 1993 could not be routine as they were outside of the standard protocol for her age group. Fortis also points to Karen's five-year survivalship visit with Dr. Hansen on March 25, 1994, and her visit with Dr. Hansen on November 19, 1991, in which Dr. Hansen's notations indicate he consulted an oncologist regarding Karen's questions around her continuing tamoxifen usage, and progress note by Nurse Krones of the Mason City Clinic on February 14, 1997 (which references Dr. Faust)[24] as specific instances in which Karen consulted with a physician about cancer—thereby entitling Fortis to judgment as a matter of law as to the falsity of the Schmidts' response to Question 18(k).

In resistance, the Schmidts predictably argue that the series of physician-patent encounters that Karen had between August 9, 1991, and August 9, 2001, were not consultations about cancer. The Schmidts point out that at no point during this time period did Karen see her oncologist Dr. Silberstein—whose last documented visit with Karen was December 26, 1990. Further, Dr. Hansen stated that while he and Karen "discussed her history of cancer [between August 9, 1991 and August 2001], [they] never actually discussed active cancer." Plf.s' Supp.App. at 325–26. The

23. Specifically, the Schmidts point out that the application in *Rubes* asked whether the applicant had *ever* had certain conditions, that the applicant *admitted* the application contained false responses, and that the applicant did not personally fill out the application. The Schmidts also contend that unlike the *Rubes* case, Fortis's enrollment form did not inquire into whether an applicant *ever* had a condition, but focused only on the previous ten years. Further, the Schmidts assert that it is undisputed that Karen disclosed information regarding her health history from 1989 through 2001 to Kiel, and that Kiel and Baumler gave Karen advice on how to complete the Fortis application. Further, according to the Schmidts, Kiel, Baumler and Karen

were all under the understanding that the Fortis application was asking a different question than the Life Investors application—and therefore, were under the understanding that differing answers on the two applications were not inconsistent.

24. As noted above in part I.A.2, the progress note only indicates that Karen discussed her concerns with Nurse Krones, and asked what Dr. Faust's opinion on the matter might be. There is no indication that Karen *saw* Dr. Faust at that time, or that Karen kept her appointment with Dr. Faust, scheduled for February 21, 1997.

Schmidts also argue that the language "consult with a physician concerning ... cancer" is *more* ambiguous than the "treatment for ... cancer" language. Plf.s' App. at 81. Citing the Webster's Collegiate Dictionary defining "consult" as "to ask the advice or opinion of," the Schmidts note that a person could ask the advice or opinion of a physician about any number of conditions they currently had, never had, or had in the past—and as such, Fortis's interpretation of this language to include the follow-up tests and five-year survivalship appointment, is unreasonable. The Schmidts argue that an ordinary reading of the language by a layperson would indicate that a person had to actually *have* the condition in order to consult with a doctor about it. Turning to Karen's five-year survivalship checkup with Dr. Hansen on March 15, 1994, the Schmidts argue that the progress note indicates that this was a consultation about the use of tamoxifen, not about cancer. Ultimately, the Schmidts contend that the ambiguity of the phrase "consult with a physician concerning" prevents a finding that the Schmidts "no" answer to Question 18(k) was false as a matter of law—thus, defeating Fortis's motion for summary judgment.

In its reply, Fortis asserts that there is no evidence that the Schmidts understood the phrase "consult with a physician concerning" in the manner in which they claim an ordinary layperson would understand it. Further, Fortis contends that the blood panels, chemical testing, bone scans, chest x-rays and mammograms were conducted to monitor for a recurrence of breast cancer due to Karen's breast cancer history, and Karen discussed the need for her to continue this regimen of testing with Dr. Hansen. Fortis takes issue with the Schmidts' categorization of the five-year survivalship visit with Dr. Hansen, and reasserts that the purpose *was* to consult about cancer. Additionally, Fortis finds Karen's "efforts to feign ignorance" as to whether she consulted with physicians concerning cancer during the ten-year period in question are unsupported by the record—which paints her as a proactive and inquisitive patient, demonstrates her knowledge of an increased risk of recurrence due to being estrogen receptor positive, and recounts that she stopped taking tamoxifen of her own volition after learning from a layperson that it was only beneficial for five-years following cancer treatment. Finally, Fortis reiterates that Karen underwent these various procedures (i.e. mammograms, chest x-rays, blood panels, etc.) *only because of* her breast cancer, to monitor recurrence. Fortis points to the fact that the coding on Karen's medical records for these procedures show that they were not part of an annual physical exam, but that they were *in addition* to those normally done at a routine exam. Finally, Fortis argues that the Schmidts have failed to show that the phrase is ambiguous in the context of the enrollment form, and that the plaintiffs have generated no genuine issue of material fact as to this issue.

*ii. Analysis.* As before, the court must first look to the pertinent language and determine if it is objectively susceptible to two or more meanings. *Met–Coil Sys.*, 524 N.W.2d at 658. In this instance, the language in question is: "consulted with a physician concerning ... cancer." Plf.s' App. at 81. In the context of the phrase, "consulted," stemming from "consult," when accorded an ordinary meaning, is defined as "to ask the advice or opinion of." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 248. This is relatively straightforward standing alone, but when paired with the term "concerning" the interpretation of this language becomes far from clear. "Concerning," when given an ordinary

meaning in the context of Question 18(k), could be either "relating to" or "regarding." *Id.* at 238. Which definition is accorded to these terms could significantly alter the meaning of the phrase "consulted with a physician concerning....cancer." Plf.s' App. at 81. For example, giving "concerning" the "relating to" interpretation would cause the inquiry to encompass discussion about anything "relating to ... cancer," which, as discussed in conjunction with the "treatment" language above, could encompass the whole spectrum of subjects relating to cancer, cancer risk, cancer prevention and cancer history. On the other hand, according "concerning" the interpretation of "regarding" appears to restrict the scope of the definition from anything even tangentially related to cancer to only those consultations revolving around cancer. Clearly, this language is susceptible to at least two different meanings, it is ambiguous and therefore must be construed against Fortis, *Utica,* 892 F.Supp. at 1203 (citing *Cincinnati Ins.,* 522 N.W.2d at 839), and accorded the interpretation most favorable to insured.

In this instance, the most restrictive interpretation of the phrase "consulted with a physician concerning ... cancer" would be that most favorable to Karen. Therefore, according "concerning" the more restrictive interpretation of "regarding," the interpretation most favorable to Karen would be: "ask[ing] the advice or opinion" of a physician "regarding" cancer. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 238, 248. Though the court has found the phrase ambiguous, and accorded it the interpretation most favorable to the insured, questions of fact requiring analysis of extrinsic evidence still remain. *See Utica,* 892 F.Supp. at 1202 ("extrinsic evidence refers to evidence other than the words of the policy") (citing *Jensen,* 510 N.W.2d at 871 and *Voeltz,* 431 N.W.2d at 785). In this case, as before in discussing "treat-

ment," the extrinsic evidence would include the deposition testimony of Karen, Dr. Hansen, Dr. Silberstein and Dr. Morton.

First, does undergoing follow-up procedures such as mammograms, blood panels, chest x-rays, and bone scans constitute "asking the advice or opinion" of a physician merely because it requires a doctor to interpret the results? Further, are these tests "regarding" cancer even if the only purpose of these tests is for the *detection* and *prevention* of cancer? These questions cannot be resolved without turning to extrinsic evidence—which, in addition to deposition testimony, would include the "special codes" Fortis claims are on Karen's medical records. Turning to the five-year cancer survivalship checkup with Dr. Hansen, the crux of the visit appears to have been Karen's questions regarding the effects of long-term tamoxifen use in light of medical conditions that ran in her family, whether she should continue on tamoxifen, and what other routine-follow up exams she should continue to undergo. Plf.s' App. at 139. Questions remain as to whether this visit, in which Karen and Dr. Hansen discussed her five year cancer survivalship, and the propriety of continued tamoxifen use, was "regarding" cancer. This, too, cannot be resolved without turning to extrinsic evidence. Finally, the court turns to whether the progress note by Nurse Krones of the Mason City Clinic on February 14, 1997 was "regarding" cancer. Deft.'s App. at 28. The progress note indicates that Karen was experiencing a number of gynecological problems and was concerned about these problems in light of her breast cancer history. *Id.* From the context of the progress note, it appears as though Nurse Krones consulted with Dr. Faust about Karen's medical issues and concerns, and that an appointment was set up with Dr. Faust the follow-

ing week. *Id.* Does consultation with a nurse, who in turn consults with a physician amount to "consulting with a physician"? Further, is contact in which the proposed insured's chief complaint is not cancer related, but where the proposed insured voices concern over cancer risks in light of her cancer history "regarding" cancer? Again, these questions of fact cannot be resolved without a review of evidence outside of the words of the policy.

Therefore, although the court has held the phrase "consulted with a physician concerning ... cancer" ambiguous, as interpretation of this phrase depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence," *Jensen*, 510 N.W.2d at 871; *Voeltz*, 431 N.W.2d at 785, a genuine issue of material fact precluding summary judgment in favor of either party has been generated. As such, as to whether the Schmidts' "no" response to Question 18(k) was false, both the Schmidts' and Fortis's Motions for Summary Judgment are **denied**.

### 4. Question 15

#### a. The question

■ Question 15 of the Fortis enrollment form asks for a "yes" or "no" response to the following question:

> Have any of the proposed insureds ever been declined, postponed, charged an extra premium or had a portion of coverage excluded for life, disability, or medical insurance or had such coverage rescinded?

Plf.s' App. at 80. To this question the Schmidts checked "no." *Id.*

#### b. Arguments of the parties

Rightfully predicting an argument by Fortis that their "no" response to Question 15 was false, the Schmidts, in their resistance, include an argument as to why their response was truthful. First, the Schmidts point out that it is undisputed that as of the date they filled out the Fortis enrollment form, they had not received any written response from Life Investors regarding the status of their application. In fact, the Schmidts claim that the only written correspondence they received from Life Investors was dated August 30, 2001, and that indicated that Life Investors had been informed of the Schmidts' request to withdraw their application. The only other written response was to Kiel, dated August 10, 2001, which stated that Karen *would be* denied and questioned whether they would like to continue with the application review. The Schmidts contend that there is no evidence that Kiel knew of Karen's denial prior to August 10, 2001. The Schmidts then argue that while the August 10, 2001, letter to Kiel indicates that a decision as to Karen's coverage had been made, that it did not necessarily reflect a final decision on the part of Life Investors. In support of this position, the Schmidts point to the testimony of Debbie Tinker, the Life Investors representative, that the Schmidts could have submitted a request for reconsideration of the decision in which they could have provided additional details regarding Karen's health history—though there was no formal process for doing so at the time. The Schmidts assert that they *chose* to withdraw the application, and that if they had proceeded with the appeal, it was possible that the decision as to Karen would have been reversed. Finally, the Schmidts contend that since the most that can be established from the record is that, prior to August 9, 2001, Kiel received a call from an unidentified Life Investors employee informing him that Karen *would be* denied coverage if they continued the application process, Fortis has not raised any genuine issue of material fact as to the

falsity of the Schmidts' "no" response to Question 15.

In its reply, Fortis resists the Schmidts' arguments by focusing on the fact that the option of trying to obtain coverage with Fortis was *not* pursued until *after* the Schmidts and Kiel knew there were problems with the Life Investors application prior to August 10, 2001. Fortis focuses on the language of the August 10, 2001, letter from Life Investors indicating that it is a "second request," as establishing that prior contact with Kiel or Baumler was made in which it was indicated that Karen would be denied. Therefore, by the time the Schmidts completed the Fortis enrollment form on August 9, 2001, they were well aware that Karen could not secure coverage through Life Investors. Fortis discounts the Schmidts' argument that, as they could have appealed, the denial was not final on August 9, 2001, by pointing to the deposition testimony of Life Investors's representative Debbie Tinker that Life Investors considered the decision final, and that the right to appeal did not affect the finality of this decision. Finally, Fortis addresses the Schmidts' argument that the application was withdrawn— claiming that *only the application as to Daniel and daughter Kathryn* was withdrawn as at that point Karen had already been denied. Fortis contends its argument is supported by Baumler's fax to Life Investors requesting withdrawal of the application "due to Daniel's spouse Karen being denied." Therefore, Fortis argues there is no genuine issue of material fact that the Schmidts' "no" response to Question 15 was false, making the Schmidts' representation false as a matter of law and entitling Fortis to equitably rescind the policy.

### c.  Analysis.

In this instance, the pertinent language at issue is "[h]ave any of the proposed insureds ever been declined, postponed, charged an extra premium or had a portion of coverage excluded for ... medical insurance... ?" There is no argument that the language of Question 15 is ambiguous, so the only question at this juncture is whether the "no" response was false. In *Rubes v. Mega Life & Health Insurance Co.*, 642 N.W.2d 263 (Iowa 2002), the court made these observations concerning the falsity, and inducement elements:

> An action to rescind a contract is regarded as less severe, and hence less demanding in its proof requirements, than an action at law for damages based on fraud. *Hyler*, 548 N.W.2d at 871. In an equitable rescission action, it is not the knowledge of falsity that is at issue, but "whether misrepresentations induced the complaining party to contract." *Utica*, 892 F.Supp. at 1195. As this court stated in Hyler, injecting an "intent to deceive" element in a rescission case would reintroduce the concept of scienter, "making the elimination of this requirement in equity cases illusory." *Hyler*, 548 N.W.2d at 872.

*Id.* at 269. Therefore, it is not a question of whether Kiel, Baumler or Karen *knew* of the falsity of the response, but only whether the Life Investors application was, objectively, denied. *Rubes*, 642 N.W.2d at 270. There is no genuine issue of material fact that the August 10, 2001, letter reflected a *final* decision as to Karen's application:

> Q; Directing your attention [to] ... the August 10, 2001, underwriting status/agent action report, does that document reflect Life Investors' final decision with regard to Karen Schmidt's application for individual health insurance coverage?
>
> A:  It reflects the underwriting decision on Karen.
>
> *     *     *     *     *     *

Q: Well, [the August 10, 2001, letter] reflects that Karen will be denied due to health history of breast cancer.

A: That's correct.

Q: Which I understand your testimony to be reflects Life Investors' final decision as to Karen Schmidt. Is that correct?

A: That's correct.

Q: Okay.

And my earlier question may have been unclear, but is it your understanding that the application was also submitted on behalf of Daniel Schmidt and their daughter Kathryn Schmidt?

A: That is correct.

Q: Okay.

And so had Life Investors yet made a decision on Daniel and Kathryn Schmidt's application?

A: No, they did not.

Q: So, it was just Karen that they had made the decision on?

A: That is correct.

Q: And that decision was to deny her application for individual health coverage?

A: That is correct.

Plf.s' Supp.App. at 276B. Therefore, as of August 10, 2001, Life Investors had officially denied Karen coverage. Life Investors also testified as to the standard procedure undertaken when it determined that an applicant was declined:

Q: .... And can you tell me what the standard practice or procedure of Life Investors in July and August of 2001 would have been [when an underwriter determined that a proposed insured would be denied] where the individual was applying with other family members for an individual health insurance policy?

A: We would have called the agent, explained our underwriting decision, and then we would have sent the underwriting status/agent action report as a follow-up in order for the agent to see if the other members listed on the application wanted us to continue to process the application for health insurance on those remaining individuals.

Q: Now, was there any type of practice or procedure in terms of the amount of time between the telephone call to the agent and the time that the underwriting status/agent action report would be sent out?

A: There wasn't a standard time.

Our normal practice was that the underwriter would call the agent and the file would be given to the underwriting correspondent to send the underwriting status/agent action report.

Plf.s' Supp.App. at 276A; *see* Plf.s' Supp. App. at 282 ("At the time of the phone call, we explain to the agency (sic) underwriting's decision based on what an applicant—on the application in order to see if they want us to continue processing the underwriting on the *remaining* applicants.") (emphasis added). However, this does not answer the question of whether Life Investors's denial of Karen was in effect on August 9, 2001—the date that the Schmidts filled out, signed, and mailed the Fortis application to Midwest Benefits.

In fact, the court finds that a genuine issue of material fact is generated as to whether or not Karen's denial was final as of the date the Schmidts filled out the Fortis Application—August 9, 2001. On one hand, there are facts favoring Fortis's position—namely, the fact that the August 10, 2001, letter mentions that this is a "second request," therefore implying that initial contact regarding the underwriting status of the application had occurred prior to that date. Kiel had no recollection of how Midwest Benefits was initially contacted regarding the underwriting status—

but believed it was either by telephone call or fax. Plf.s' App. at 8–9. Life Investors testified that its normal practice and procedure was to contact the agent via telephone and explain the specific underwriting decision. Plf.s' Supp.App. at 276A. The procession of events, specifically the fact that the Schmidts prepared an application with Fortis prior to August 10, 2001, viewed in the light most favorable to Fortis, supports the inference that Life Investors did indeed contact Kiel and informed him that Karen would be denied due to her breast cancer history—which spurred the Fortis application. Karen testified that she had received a call from Kiel stating that the Life Investors application was not going to work out, and it was at that time they started pursuing other options. Deft.'s App. at 152. Further, Kiel testified:

Q: Well, if your office had been advised initially that Karen was going to be denied, would it have been your practice to request that they reconsider or have somebody else look at that application? . . . .

A: No. If they indicated that it will be denied, there's nothing—nothing we could do about it.

Deft.'s App. at 125. And, in fact, nothing more was done to try to salvage the Life Investors application. The final fact in favor of Fortis is Baumler's fax to Life Investors on August 28, 2001, which asked Life Investors to discontinue evaluation of the Schmidts' application "due to Daniel's spouse Karen being denied." Plf.s' App. at 117. Drawing all reasonable inferences in Fortis's favor, the plaintiffs are clearly not entitled to judgment as a matter of law that their "no" response to Question 15 was not false.

On the other hand, viewing the facts most favorable to the plaintiffs, a genuine issue of material fact prevents summary judgment in favor of Fortis. While Life Investors's standard practice is to call the agent and inform them of the underwriting decision, Life Investors could not attest to whether such a call was made to Kiel, and if it was, what information was relayed to him. Further, Kiel, Baumler and Karen all testified that the Fortis application wasn't pursued until they knew there was a problem with the Life Investors application, or until they knew that Karen *would* *be* denied—never that she *had been* denied. Plf.s' App. at 19 (Kiel—"That [Life Investors] was in the process of denying."); Plf.s' App. at 27 (Baumler—"knew it was actually going to be denied . . . when we got the [August 10, 2001] letter"); Deft.'s App. at 166 (Karen—"We were never denied."). Kiel testified that the Life Investors application was withdrawn, and never actually denied. Plf.s' App. at 10. Karen testified similarly:

Q: . . . . After you received that phone call from Loren Kiel saying there was a problem, can you lead me through that?

A: After we received the phone call from Loren, stating that the—that we needed to take another direction, we needed to apply to another company, at that point we withdrew our application.

We were never denied. We never received a denial. We just withdrew our—Loren sent a letter, I believe, or there was withdrawal of that request.

Q: And was that instruction that you gave to Loren's office on how to handle that application?

How did it get to the point where that letter got sent out from his office?

A: Because we were going to apply for the insurance through Fortis. And we no longer needed to carry on our relationship with Midwest—or help me, Life Investors. And we just discontinued it.

\*  \*  \*  \*  \*  \*

Q: Ms. Schmidt, you told me earlier today that the Life Investors' application had been denied, did you not?

A: I did. I was in error.

Q: Now, was it your understanding that had you not withdrawn the Life Investors' application, that it was going to be denied?

A: Not really, no. Because Loren said, we have a potential problem here.

And I think Loren was under the impression there was a potential problem, through whatever communications he had.

Deft.'s App. at 166. Further, it is undisputed that the Schmidts did not receive any direct correspondence from Life Investors before August 30, 2001, and that Midwest Benefits received only a single written correspondence from Life Investors—the August 10, 2001, letter. Further, though it was not argued by the parties, Baumler's potential knowledge of Karen's denial by Life Investors (as could be inferred from her faxed request to Life Investors to discontinue examining the Schmidts' application due to Karen be denied) could be imputed to Fortis on the basis that Baumler was also an agent under Iowa Code § 515.125. *See* Plf.s' App. at 117 ("due to Daniel's spouse Karen being denied"). Viewing the facts in the light most favorable to the plaintiffs, while it is clear that there was "a problem" with the Life Investors application as of August 9, 2001, there is a genuine issue of material fact as to whether it was denied as to Karen as of that date.

As a genuine issue of material fact as to Karen's denial by Life Investors as of August 9, 2001, is raised when looking at the facts in the light most favorable to either party, both the Schmidts' and Fortis's Motions for Summary Judgment are **denied** as to the falsity of Schmidts' response to Question 15.

### III. CONCLUSION

For the foregoing reasons, as to Fortis's claim that Loren Kiel and Karen Schmidt acted together to perpetrate a fraud upon Fortis, the Schmidts' Motion for Summary Judgment is **granted in part** and Fortis's Motion for Summary Judgment is **denied in part**. As a genuine issue of material fact has been raised as to the falsity of the Schmidts' "no" responses to Question 18(k) and Question 15 of the Fortis enrollment form, which thereby raises a genuine issue of material fact as to whether Fortis's rescission of the policy was justified, both the **Schmidts' Motion for Summary Judgment and Fortis's Motion for Summary Judgment are denied in part**. Finally, as the plaintiffs' breach of contract claim is predicated on a finding that Fortis wrongfully rescinded the policy, summary judgment on that claim is likewise inappropriate and both the **Schmidts' Motion for Summary Judgment and Fortis's Motion for Summary Judgment are denied in part**.

THEREFORE, the ultimate disposition of the cross-motions for summary judgment is that the **Schmidts' Motion for Summary Judgment is granted as to Fortis's claim of fraud upon the principal, and denied in all other respects. Fortis's Motion for Summary Judgment is denied in its entirety**.

**IT IS SO ORDERED.**